MONTGOMERY & E. R. CO. (OTIS v.). See Case No. 10,612.

MONTGOMERY & E. R. CO. (STRANG v.). See Case No. 13,523.

MONTGOMERY & E. R. CO. (YOUNG v.). See Case No. 18,166.

MONTGOMERY COUNTY (THAYER v.). See Case No. 13,870.

_____

## Case No. 9,738.

### The MONTICELLO.

[See Case No. 3,971.]

_____

## Case No. 9,739.

### The MONTICELLO.

[1 Lowell, 184.] [1]

District Court, D. Massachusetts. Dec., 1867.[2]

COLLISION—FOG—BOTH VESSELS IN FAULT—WITNESSES.

1. There is a fog at night, within the meaning of the act of 29th April, 1864 [13 Stat. 60], re-

_____

[1] [Reported by Hon. John Lowell, LL. D., District Judge, and here reprinted by permission.]

[2] [Affirmed in Case No. 3,971.]

quiring a horn to be sounded by sailing vessels, whenever the weather is so thick that the horn would be heard farther than the ordinary signal lights of the vessel could be clearly distinguished.

2. Where a steamer was running at least eight knots an hour on a calm foggy night and came suddenly on a schooner a little on the starboard bow, *held*, on the opinion of experts, that the steamer should have starboarded her helm, and having had time to do so was in fault for porting, and the damages were decreed to be divided, though the schooner was in fault for not sounding a fog-horn.

3. There is no objection to one party in a collision cause calling as witnesses persons who were on board the vessel of the other party.

Libel for damage caused the schooner Phoebe by the steamer Monticello, on the night of March 11, 1867, about twenty-six miles to the southward and eastward of Cape Lookout. The witnesses for the libellants deposed that they saw the mast-head and starboard side-lights of the steamer at a few minutes after ten o'clock, at a distance which they estimated at a mile, and about two points forward of their port beam. The crew of the schooner hailed the steamer, but she kept her course until close to the schooner, when an order was heard to port the helm, but they observed no change of course, and the claimants' steamer struck the schooner near the port fore-rigging and cut her down. The crew were saved by the steamer. It appeared that the schooner was close-hauled on the port tack. with a wind that barely gave her steerage way. The steamer was bound down the coast in a south-westerly direction, and was running at least eight knots, with one lookout near the bows. The lookout saw the red light of the schooner very near him and a little on his starboard bow, and reported to the mate on the bridge, who gave the order to port, which was obeyed, and the schooner had swung off to starboard one and a half or two points before she struck the Phoebe. Concerning the amount of haze or fog the evidence was conflicting.

C. T. & T. H. Russell, for libellants.

The steamer was going too fast. The place was a thoroughfare for ships and vessels of all kinds, and eight miles an hour was excessive speed: The Bay State, 18 How. [59 U. S.] 89; The St. Charles, 19 How. [60 U. S.] 108. There should have been a lookout on each bow on a vessel of this size. When the schooner was discovered the wrong order was given.

J. C. Dodge, for claimants.

The fault lies entirely with the schooner for not sounding a fog-horn. When we came suddenly upon her we did right, or if not, it was so late that we should be excused, the first fault having been on the other side.

LOWELL, District Judge. I am fully satisfied that whatever may be the truth in relation to the other matters, the steamer was in fault in porting her helm. The experts on both sides agree that the order should have been to starboard. It is said to be a general rule of navigation that when the vessel which is bound to give way sees a light close at hand on the port bow or directly ahead the helm should be put to port, but if on the starboard bow, the helm should be starboarded. Whether this be a general rule or not, it is manifestly a true rule for a case like this, where the red light of a sailing vessel is seen in a calm by a steamer going at least eight knots, because to clear her bows the steamer will require but a slight change, comparatively of only one point, as the experts say, to clear the steamer on that side, while it required three points on the other, the speed of the schooner counting for very little under the circumstances. I am fully satisfied, from all the evidence, that the steamer would have avoided the hull and probably even the head-gear of the Phoebe, if the mate had not unfortunately given the order to port, and insisted upon it, when some one, who, for aught he knew, he says, was the master, cried out to starboard. Nor can I find that the emergency was so sudden and extreme as to excuse such a mistake. The order to port which was heard on board the schooner was evidently the second order, which the mate says he gave very peremptorily when he heard some one crying to starboard, and it did not even then appear to the master of the schooner too late, if only the proper command had been given. From a consideration of what passed on board both vessels, and of the change of course which actually took place, I am convinced that there was ample time for this steamer, which was a quick steering vessel, to get out of the way, after seeing the schooner's signal.

It is said on behalf of the steamer, as showing fault on the other side, that the night was very thick and foggy, so that the lights of the schooner could be seen for only a few hundred feet, and that the schooner should have sounded a fog-horn, as required by the statute of April 29, 1864 (13 Stat. 60), c. 69, art. 10, which enacts that whenever there is a fog, the fog signals shall be carried and used.

The libellants contend that there was no such fog as is here referred to. They admit a haze, mist, or smoke, as it is variously termed by their witnesses, but say that the ordinary lights of a vessel could be seen a mile off. The claimants' witnesses represent a very much denser fog than this, and think a few hundred feet are the extent of the range of such lights at that time.

What is a fog such as the statute intends? Is it every haze, by day or night, of whatever density? To give the statute a reasonable interpretation we must suppose that its intent is to give to approaching vessels a warning which the fog would otherwise deprive them of. By day there must be fog

enough to shut out the view of the sails or hull, or by night of the lights, within the range of the horn, whistle, or bell. It means that a safeguard of practical utility under the circumstances, should be provided. If it be entirely plain, upon the evidence, that the ordinary signals are sufficient and more efficacious than the horn could be, the horn will not be required. But a serious doubt upon this point must weigh against the vessel failing to comply with the statute. I do not consider it to be enough to aver and prove that the lights might be seen in time to avoid serious danger; but where it is evident that the fog signal could not have been so useful as the ordinary signal, it need not be used. Thus if the lights could be plainly and easily made out at a mile, and the foghorn could not be heard at a third or a quarter of that distance, I cannot suppose that such a state of the atmosphere would amount to a fog in the sense of the law. It is to guard against some danger which the fog would or might cause, and from which the horn might possibly guard, that it is to be blown.

Before considering the state of the weather, I may dispose of one defence set up by the schooner, that her hail was equivalent to the horn. The evidence does not satisfy me that the fact is so, and it would require very strong evidence to outweigh the expressed legislative opinion that the other signal is the better.

Coming to the question of fact, it is found that the schooner's men, with a rather suspicious unanimity, give it as their opinion that a vessel's lights could be seen a mile off; and that they did see the steamer's lights at that distance. The estimates which sailors make of time and distance on such occasions are notoriously untrustworthy, not so much from any wilful misstatement, as from the great difficulty of arriving at satisfactory conclusions in their own minds, as well as an inability to express their precise meaning. The same witness will often give these measurements differently in different parts of his evidence. Looking carefully at what they did on board the schooner, I am unable to account for the six or seven minutes which would elapse before the steamer could make a mile. They began to shout very soon after they saw the other vessel, and yet two of the men who were roused by the shouts had not reached the deck when the vessels came together. They think they shouted for a considerable time, but they were not heard on board the steamer until about the time the light was seen, and then they were heard without difficulty on that calm night, and the steamer's second order to port was heard by them. On a clear night the steamer's mast-head light ought to be visible at a distance of at least five miles, if she had the regulation lights, as it is proved she had; but it appears to have broken upon the schooner's crew suddenly, three

of them seeing it at once, and one likening it to a star, at the distance which they now estimate at a mile. I think that estimate may probably be influenced by the suspense and anxiety which made the time seem very long before their hail was observed. It is a very delicate and difficult task to decide such a question as this upon written testimony; and I have endeavored to bring it to the test of the various circumstances given in evidence. One of these, appealed to on both sides, is the distance at which the lights of the steamer were actually seen, after the collision, by the men on the wreck; but I have not been able to satisfy myself what that distance was. I can only say that I do not think it is proved to have been any thing like a mile.

There are three witnesses who stand in a peculiar relation to the case. They are steamer's men, called and examined on behalf of the schooner. The fact that they were used on that side has been severely commented upon, and some remarks of Dr. Lushington were read, in which that learned judge disparages affidavits taken from the hostile camp, as he expresses it. Any thing like tampering with witnesses would deserve and would receive the sternest reprehension of the court, but the case shows nothing of that sort; and it is to be remembered that we are not presented with ex parte affidavits, as in the case cited, but with full examination and cross-examination which develop the history of their engagement as witnesses and show nothing improper. These three witnesses give their evidence with moderation and with no obvious bias, and I am disposed to rely a good deal upon their statement of the weather. They all say that it was foggy. In their estimates of how far the running lights of a vessel could be seen they differ, and had evidently not concerted their answers; one says two hundred and fifty yards; one, twice the steamer's length, which would be some thing over two hundred yards; the third gives two estimates, the largest of which is a quarter of a mile. The best judgment I have been able to form upon all the evidence is, that there was a fog, which, though not as dense as many others, was enough so to render the sounding of the fog-horn a proper precaution. Upon the evidence, such a signal might probably, on a calm night like this, have been heard on board the steamer at the distance of half a mile, and I am not satisfied that with ordinary vigilance the schooner's lights would have been clearly distinguishable at that distance. This opinion is founded upon the direct statements of the steamer's crew, but especially of those three whom the libellants called; and upon the facts that the lights of neither vessel were seen at any considerable distance from the other, that the fog was a sea fog from the north-east, and the other circumstances above referred to.

Both parties were in fault, and it is impos-

sible to say that either fault was the sole cause of the collision. Damages to be divided.

This decree was affirmed on appeal, October term, 1870; and upon the question of fault in the steamer, the court added to the reasons given in the district court, that she had no right to go so fast in a fog as to be unable to stop or reverse, if necessary, within the time shown to have been at her command in this case. [Case No. 3,971.]