## THE TURRET CROWN (four cases).

(Circuit Court of Appeals, Second Circuit. January 10, 1924. Reargument Denied January 25, 1924.)

Nos. 65–68.

1. **Shipping ⊜⟞132(5)—Evidence held sufficient to show repairs to steering gear insufficient.**

On libels against a vessel for damages to cargoes, evidence *held* sufficient to show that repairs made to the steering gear were not those which should have been made in the exercise of reasonable care, after disclosures and recommendations made in a survey.

2. **Shipping ⊜⟞132(5)—Evidence held sufficient to show defective steering gear caused distress of vessel.**

On libels against a vessel for damages to cargoes, evidence *held* sufficient to show that damages to the double bottom tanks of the vessel in which its fuel oil was stored, and which caused its return to port was due to the added strain resulting from its defective steering gear.

3. **Shipping ⊜⟞121(1), 137—Shipowner warrants seaworthiness, and not merely due diligence to make vessel seaworthy.**

In the absence of stipulation to the contrary, a shipowner absolutely warrants that his ship is seaworthy in all respects, and not merely that he has used due diligence to make her seaworthy, regardless of his knowledge or ignorance, of his care or negligence; and this rule is not affected by the Harter Act.

4. **Shipping ⊜⟞121(1)—That vessel encountered heavy weather no defense for claims to damages to cargo.**

The mere fact that a vessel encounters heavy weather is no defense to claims for damages to cargo, if any defect or unseaworthy condition of the ship existed.

5. **Courts ⊜⟞98—On questions of commercial law, American decisions should conform to English, if not contrary to public policy.**

It is a settled rule in our courts that in matters of commercial law our decisions should conform to the English decisions, in the absence of some rule of public policy which would forbid.

6. **Shipping ⊜⟞125—Return to port for repairs for safety held not "deviation."**

Where it became necessary for the safety of the ship, crew, and cargo to seek a port for repairs, there was no such "deviation" as would deprive the ship of the benefit of protective provisions of the bills of lading;

⊜⟞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

"deviation" being a voluntary departure, without necessity or any reasonable cause, from the regular or usual course of trade.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Deviation.]

7. **Insurance** ☞606(3)—**Right of insurer to subrogation against carrier stated.**

An insurer is subrogated to the rights of the shipper against the carrier, in the absence of anything to the contrary contained in the bill of lading; but ordinarily, if the bill of lading gives the carrier the benefit of shipper's insurance, insurer is not subrogated.

8. **Insurance** ☞603—**Insurer may decline to indemnify shipper until carrier's liability determined.**

Where a policy is void by agreement, if insured makes a covenant to give the benefit of his insurance to the carrier, insurer can require insured to sue the carrier first, and may decline to indemnify him until carrier's liability is determined.

9. **Shipping** ☞140—**Bill of lading clause, giving carrier benefit of loans by insurance companies, held invalid.**

Bill of lading clause, that carrier should be entitled to the benefit of any insurance on the goods and to "any payments made by or on behalf of the insurers thereof, whether under the guise of advances, loans, or otherwise," could not be sustained, if the policies provided that there should be no liability in case the shipper had agreed to give the benefit of it to the carrier; the quoted phrase being intended to give the carrier indirectly an exemption from liability for which the carrier could not stipulate directly.

10. **Shipping** ☞131—**Advancements by insurers as loan held not to inure to benefit of carrier.**

Where a bill of lading provided that carrier should have the benefit of insurance, and any payments made by insurers "whether under the guise of advancements, loans or otherwise," and policies procured by shippers provided that insurers should be discharged from any liability in case the goods were carried under a bill of lading in which carrier stipulated for the benefit of shipper's insurance, *held*, that advancements made by insurers as a loan did not inure to the benefit of carrier, and that the character of such advances as loans rather than payments was not affected by the fact that certain insurers did not take formal loan receipts for some of the loans which they made.

11. **Shipping** ☞132(3)—**Presumed that amount claimed in libel is one for which no payment received.**

Where libelant has been paid part of his loss by insurer, the amount claimed in the libel is presumed to be the amount of damages for which it has not received payment.

12. **Shipping** ☞121(1)—**Stipulation as to seaworthiness in policy held not available to carrier.**

Under a cargo policy providing that "the seaworthiness of the vessel as between assured and assurers is hereby admitted," the admission is not available to carrier, but only to shipper, and carrier is not thereby relieved from liability to shipper for lack of seaworthiness of the vessel.

13. **Shipping** ☞132(3)—**Burden on carrier to prove foreign cargo policies inured to its benefit.**

On libels against a vessel for damage to cargo, in the absence of information as to the form of foreign cargo policies, the burden was on carrier to prove that policies were of such character as to inure to its benefit.

14. **Admiralty** ☞66—**Denial of application to amend ad damnum clause of libel held not erroneous.**

Where, on libel of a vessel for damage to cargo, libelant stipulated the damage to be $100,000, and ship was thereafter released, *held*, that it was not error for the trial court, in the exercise of its discretion, to refuse to permit an amendment of the ad damnum clause in the libel from $125,000

to $375,000, on the ground that the extent of the actual damages did not become known till the cargo was discharged at destination.

Appeals from the District Court of the United States for the Southern District of New York. ·

Separate libels by the Vulcanite Roofing Company, by J. Aron & Co., Inc., by Carlo Repetto and by Giobatta Sacco and another against the steamship Turret Crown and her claimant, the Commonwealth Steamship Company, Limited. From a decree dismissing the libels (282 Fed. 354), libelants appeal. Reversed.

Certiorari denied 44 Sup. Ct. 403.

Libels filed by four cargo owners, libelants, against the steamship Turret Crown, her engines, etc., for loss of cargo. Decree for claimant. Libelants appeal. ' Reversed.

Bigham, Englar & Jones, of New York City (D. Roger Englar and Forrest E. Single, both of New York City, of counsel), for appellants.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (John M. Woolsey and Theodore M. Hequembourg, both of New York City, of counsel), for appellee.

Before ,ROGERS, MANTON, and MAYER, Circuit Judges.

MANTON, Circuit Judge. These four cases were tried below as one and will be considered here in one opinion. The Turret Crown was a turret type vessel, built in 1895. Her gross tonnage was 1,857 tons and her net tonnage was 1,142 tons. She had been equipped as a coal burner, but in 1916 was converted into an oil burner, and made arrangements for the carriage of fuel oil in her double bottom tanks, which were previously used for water ballast. She was employed on the Great Lakes, and some few years previous to the event herein an extension piece was fitted on her rudder. This extension piece was not removed when she was put back into ocean service, and it was on her rudder when she received the appellants' cargoes for transportation. It is said that this extension placed an additional strain on the vessel's steering gear and contributed to the breakdown of the steering engine, which is one of the claims of unseaworthiness.

In October, 1916, she encountered a severe hurricane in the Pacific Ocean while on a voyage from Seattle to Havana. She called at San Pedro to discharge a part of her cargo and recondition, and then proceeded to Salina Cruz, where she was surveyed. Later she proceeded to Jacksonville for fuel oil and temporary repairs. At Jacksonville the oil was found to be leaking from the top of tank No. 2, and during the voyage to New York water and oil appeared above the tops in holds Nos. 1 and 2. It appears that but few—four or five vessels—have been converted, when over 15 years old, from coal to oil burners, and the instant case appears to have been the first where there was not an installation of deep tanks, in addition to double bottom tanks. Oil is much more difficult to contain than water. Small leaks in a water tank tend to correct themselves by the formation of rust; whereas oil not only does not cause rust, but tends to dissolve rust, and for this reason it is pointed out that the old ballast tanks could not safely be

used for the carriage of fuel oil, unless they were in very good condition.

When the vessel arrived at New York, repairs were made to the top of No. 2 tank, but no repairs were made to No. 1 tank, nor was it examined with care, owing to the fact that it was full of fuel oil. Repairs necessary to No. 2 tank top were not attributable to the heavy weather through which the vessel had passed, but the surveyors, representing both the owners and the hull underwriters, agreed that the damage was attributable to wear and tear. The nature and extent of the repairs to No. 2 tank appear in the survey. She was not dry-docked in New York. After the tank top was repaired, the tank did not leak under the ordinary test. The tanks which leaked on the voyage from Jacksonville to New York were the same tanks which leaked on the voyage involved in this case. No. 3 tank did not leak on the voyage from Jacksonville to New York, nor did it leak on the voyage here involved. In view of the evidence showing failure of the tanks on the Pacific Coast and at Jacksonville, repairs were necessary on account of the wear and tear, and particularly so in respect of these tanks, to prepare them for this trans-Atlantic voyage.

The Turret Crown left her pier in New York on February 19, 1918, bound for Genoa, Italy, laden with a general cargo; but she was obliged to remain at anchor off the Statue of Liberty until February 25th, because of the defective condition of her steering gear. Because of the bad condition of her steering gear and the leakage of large quanties of sea water into her double bottom tanks, she was unable to finish her voyage after proceeding 150 or 200 miles, and on February 28th, it was decided to return to port. She at this time was completely disabled, and drifted about until March 7th, when a revenue cutter took her in tow. She reached Boston under this tow on March 9th. After temporary repairs, she proceeded to New York City, where the balance of her cargo was discharged and permanent repairs effected. The bottom tank tops in Nos. 1 and 2 holds were leaking, and a considerable amount of cargo was damaged by contact with water and oil. While the cargo was on the pier in Jersey City, a portion of it was damaged by flood. After the vessel was repaired, she reloaded with so much of the cargo as the surveyors considered fit to go forward, and resumed her voyage in July, 1918, five months after she originally sailed.

The court below found the ship unseaworthy in respect to the condition of the steering apparatus and her bottom tanks, but held that, by reason of a clause in the bill of lading which exonerated the shipowner from liability for "unseaworthiness of the ship even existing at the time of shipment or sailing on the voyage, providing the owners have exercised reasonable care and diligence to make the ship seaworthy," it was not liable. On this appeal, it is urged that the District Court erred, first, in holding that the defective condition of the steering gear decreased, instead of increased, the strain upon the vessel when she encountered heavy seas, and that the defective condition of the steering gear did not contribute to the cargo damage complained of; second, that the court erred in holding that due diligence to make the ship seaworthy was divisible, in the sense that a shipowner who has

failed to use due diligence as to one part of his vessel may disclaim responsibility for the defective condition of another part in respect of which he had used diligence; third, the court erred in holding that the owners used due diligence to make the double bottom tanks seaworthy; fourth, that the court erred in denying a motion made by the appellant Vulcanite Roofing Company for leave to amend its libel by increasing the amount of damages claimed; fifth, that the court erred in the dictum of the opinion holding that if there be liability the claim of the appellant Vulcanite Roofing Company would have been subject to a credit of the carrier on account of sums advanced to this appellant by certain of its underwriters.

The bill of lading clause provided as follows:

"It is mutually agreed * * * that the carrier shall not be liable for loss or damage occasioned by * * * any latent defects in hull, machinery, or appurtenances, misfeasance, error in judgment, any act, neglect, or default whatsoever of pilots, masters, or crew in the management or navigation of the ship, collisions and all and every other dangers and accidents of the seas, rivers, and canal, and of navigation of whatever nature or kind excepted or unseaworthiness of the ship, even existing at time of shipment or sailing on the voyage, provided the owners have exercised due diligence to make the vessel seaworthy; * * * nor for land damage or damage * * * by contract with other cargo or sea water; * * * nor for risk of craft, hulk or transshipment; nor for any loss or damage caused by the prolongation of her voyage and/or delay occasioned by any reason whatsoever. * * *"

[1] There are contradictions in the testimony as to the condition of the steering gear, the tanks and the weather. The report of the survey made when the steering gear was examined at Salina Cruz, Mexico, on her voyage to Havana, under the heading of "Steering Gear and Engine" reads:

"Steering Gear and Engine.—Located fractures sole plate. Steering engine patched (old sore), but show signs of being strained. All steering chains, port and starboard, badly strained. Found two defective links on port side (section). Fair leads and steering rods look O. K. Relieving spring port side one turn of spiral broken.

"Hand Steering Gear.—Right and left hand screws apparently bent. Starboard nut fractured and patched. (Looks old sore.) Looks started."

"Steering Gear and Engine.—Recommended new sole plat for steering engine. All new steering chains required. Fair leads taken adrift and examined. New pins if required. Relieving spring serviceable, but new one to be supplied and shipped first opportunity.

"Right and left hand screw to be taken adrift, straightened, and trued up in lathe and new nut fitted."

The only repairs made, according to the evidence, after this and before the voyage in question, were the "band on sole plate, screw hand steering gear straightened, new spring on steering chain, and chains annealed." This did not follow out the recommendations made when the apparatus was examined at Salina Cruz. The bed plate, instead of being renewed, was patched. When the vessel was in New York, she was surveyed by the representatives of her owners and the hull underwriters and underwent extensive repairs. No one looked after her steering engines, and a log entry made July 20, 1918, indicates the steering engine was broken when they were shifting her berth. The deck log records that:

On February 19th, at 8 a. m.: "Found steam pipes on steering eng. broken, shore day watchman employed. 11:30 a. m. Cast off and proceeded, c/o two tugs and pilot to anchor off Statue of Liberty, using hand steering gear." February 20th: "Steering gear pipes repaired and steam turned on; found valve chest of same engine broken. 4 p. m. Part of steering eng. taken on shore to be repaired." February 21st: "2 p. m. Machinists aboard with repaired valve chest off steering engine." "6 p. m. Hove short, then found steering gear again broken. Ordered 45 pc. chain. Broken piece machinery taken ashore."

The log records for the 24th, 25th, and 26th indicate trouble with the steering gear, and it is satisfactorily shown that the trouble with the steering gear was encountered before any unusual weather. One record at 3 a. m. February 26th reads:

"At 3 a. m. some trouble was experienced with the steering gear, which had become loose on its foundations; the vessel was hove to while repairs were made. At 4:15 a. m. she proceeded again. The wind increased to a fresh gale, with heavy rain and a high sea, in which the steamer rolled badly and was constantly swept by the seas."

The deck log under dates of February 27th and 28th reads as follows:

"5 a. m. Steering engin stuck hard aport. Found old patch bearing hard apart, and found an old patch bearing hard on collar of control valve bevel wheel; repaired same.

"11:20 a. m. Proceeded full speed, finding steering gear still jamming; impossible to steer the ship.

"0.25 p. m. Stopped and altered control valve on steering engine.

"1:35 p. m. Proceeded. No improvement in steering gear.

"3:15 p. m. Stopped. Found old patch on frame of steering engine had dropped down on collar of control valve bevel wheel. Renewed stand on frame of engine.

"4:10 p. m. Proceeded full speed. Steering gear still jamming; unable to steer vessel.

"6:00 p. m. Stopped vessel. Took control on steering engine adrift.

"7:20 p. m. Proceeded. Steering engine now as bad as ever.

"8 p. m. Stopped and altered control valve back to original.

"8:30 p. m. Proceeded, but still unable to steer the vessel.

"9 p. m. Decided to return to port on account of steering engine, water in fuel oil, and inability to keep up steam."

February 28th—engine room log:

"5 a. m. Steering engine stuck hard aport. Found old patch bearing hard on control velve bevel wheel; stopped 5 a. m.

"Slow ahead, 11:10 a. m. Steering engine working very badly.

"Full ahead 1:35. Steering control valve stopped 3:15.

"Old patch on steering engine tightened up. Slow ahead 4:10 p. m. Steering engine working very badly. Stop 6 p. m. Altered control valve twice in this watch. Full ahead 7:20 p. m. Stopped 8 p. m. Steering engine working very badly at full speed; at half speed it works all right."

March 1st—deck log:

"Proceeding half speed a/c steering gear.

"9 p. m. Put away full speed. Steering wheel jammed on star helm; S. S. swung around from W. N. W. to S. and E., causing seas to break on board with tremendous force."

March 1st—engine room log:

"At 9 p. m. last night captain decided to return to New York. Cause— Steering engine will not keep vessel on her course while going full speed.

"Other causes—Water in the fuel oil tanks and leaky condenser."

March 2d—deck log:

"8:10 a. m.   Three-quarter speed.   Helm jamming.
"1 p. m.   Slowed down for repairs to steering gear.   Disconnecting steam gear and putting in hand gear."

March 2d—engine room log:

"9 a. m.   Stopped at 9:15.   Dirty fuel oil.   Altered control valve.   Full ahead 10:20."

March 7th—deck log:

"S. S. steering badly in hand gear."

March 8th—deck log:

"All hands carrying roofing paper from No. 1 hold to engine room for fuel to raise steam for steering gear and pumps, as it is practically impossible to steer the ship by hand.   Stacked over 200 rolls on deck ready to pass below. Steam raised by 9:15 a. m.
"Paid out more cable, and cutter hauled in hawser to freshen the nip; also connected steam steering gear.   Fresh to mod. winds and heavy swell.   S. S. rolling heavily.
"Steering gear frequently jamming, endangering to breaking of hawser.
"Frequent stoppages, owing to steering gear jamming."

March 9th—deck log:

"2 a. m.   Unable to get steam for steering gear, so resumed steering by hand."

It is apparent from these log entries and the testimony that the repairs which were made in New York were not those which should have been made in the exercise of reasonable care after the disclosures and recommendations made in the Salina Cruz survey.   The chief engineer testified that, the day after she left, she got into bad weather, and it was reported to him that he was getting water in the fuel; that he went back and tried to pump it out, and tried to transfer the pump on the tank, tried the settling tanks, tried No. 2 tank, and at the same time they were getting water there.   No. 3 tank was all right.   He went to No. 1 tank and got water.   Nos. 1 and 2 tanks were the same.   He says that at that time the steering engine began to give trouble.   He went to start the steering engine, and found the foundation bolts were all slack.   They went through the deck, and they went through into No. 3 hold.   As to the patch of the steering engine, he testified that, underneath the control valve, there was "something or other" broken out, and he put a wrought iron patch on there, with four or six bolts, three-eighths of an inch in diameter.   The collar on the top revolved around with the bevel wheel.   When they started to work on the foundation, it worked this patch around and jammed the collar, so that when they got her hard over, she stuck, and they could not move it from the breach.   He said he raised the collar and jammed this patch up, and it still kept coming down, and he cut out about three-fourths of an inch of the patch.   He did not take anything off the collar.   Finally he came to the conclusion that he would turn back, and, since they could get no oil to turn back, they did so under hand gear.

[2] The witnesses called on both sides agreed that the defective steering gear increased the strain on the vessel in heavy weather. The court held, however, on the authority of Admiral Knight's book on Modern Seamanship (7th Ed ) p. 509, that the steering gear is of no help to a vessel in heavy weather. We think it is authoritatively established that Knight's theory of seamanship, adopted below, is not the modern or practical one  Knight does not say that a vessel's steering gear is not an important factor in navigating here safely in heavy weather. Knight says:

"The opinion is gaining ground of late years that a steamer of this type should run slowly before a sea, or lie to with the sea astern or on the quarter, and this view is supported both by theoretical considerations and by a convincing amount of practical experience."

This statement of necessity implies ability to steer the vsesel; otherwise, it would not be possible to take such a position with reference to the sea. The captain prosecuted his voyage during the intervals when the steering gear was actually undergoing repairs, and did the best he could in the stormy weather. The entries in the log show that the ship was so navigated. Under date of February 28th, the following entry appears:

"Proceeded full speed, finding steering gear still jamming, impossible to steer the ship." Later on the same day: "Reduced speed and hove to."

Capt. McNeill testified:

"Q. Captain, do you know of any instances where the steering gears have broken in a following sea? A. Yes, sir; I remember one instance that was a good long time ago, but I remember it very well. It was in the Ethiopia, belonging to the Anchor Line, and at that time there was great discussion in nautical circles about heaving a ship to with her quarter to the sea. Well, we tried it, and we damaged our steam steering gear, and we never did it again.

"Q. You did not have your engines working then? A. Very slowly, sir; just turning over. * * *

"Q. This newspaper discussion that you spoke about related to the comparative safety of heaving to, to the wind and sea, and lying with the wind and sea on the quarter, didn't it? A. Yes; that was the discussion.

"Q. There was some discussion in the British papers some years ago about that? A. Yes, sir.

"Q. And there was a school that said the best way for the ship was to lie with her quarter to the sea? A. A small school; yes.

"Q. I understand that school has gotten smaller ever since? A. Certainly; I do not think it exists now."

We are satisfied that the defects in the steering gear added to the strains on the vessel as qualified experts declared. The proximate cause of the distress of the ship, which ultimately required her to return to port, was the defective condition of the steering gear. The failure of the steering gear and inability to control the vessel produced a wrenching and straining and pounding of the vessel, which in turn resulted in damage to the tanks. It was an unseaworthy condition of the vessel. The witnesses called testified that the patch described was not a permanent repair of the bed plate, and that a piece of material which had been broken by strain could not safely be patched, if it was subject again to similar strain. This patch has been referred to as an "old sore," and ample notice of this defect was either known or

could have been made known by the exercise of reasonable care. If the steering engine had been properly secured, it would not have worked loose in bad weather, and the evidence shows that other parts of the steering gear would break before the steering engine would work loose.

It is argued by the appellee that the steering gear did not give trouble for some 48 hours after the trouble on February 26th, but the log entries show trouble every day with the steering gear. On the 27th there was no entry of trouble in the deck log; but there is an entry in the engine room log to the effect that the control valve of the steering gear was overhauled. Throughout the deck log there are records of trouble experienced with the steam control valve. On the following day, February 28th, it is recorded:

"5 a. m. Stopped; steering gear jammed. Engineers took steering gear apart, and found an old patch bearing hard on collar of control valve bevel wheels; repaired same."

This entry shows that the control valve, which had previously given trouble, operated continuously to disable the steering gear, which finally became useless. It also showed the trouble with the control valve was due to the old patch mentioned in the Salina Cruz survey. It was only after the steering engine was opened up for examination that the officers realized just what had been the cause of their previous difficulties in steering the vessel. The log establishes this trouble as a serious one from the time the vessel left New York. The chief engineer testified that the steering gear was found to be loose on its foundations on the day after leaving New York. He said he found the foundation bolts all slack and—

"They went through the deck, and they went through into No. 3 hold, and to get into there we had to move a lot of cargo, and the weather was that bad it wasn't safe to take the hatches out, we had two off, and had them standing by to put them on again if she shipped any heavy water. I went down myself with a Stillson wrench to get to two of them; couldn't get to the others. I think there was 12 bolts in there. I tightened up the 2, and had to go ahead again. Went ahead again on the steam, and of course the working of the engine drawed down the small patch that there was on the top of the bevel wheel, control valve bevel wheel, and that went into the mesh too deep, and she struck over on one side, and we put it out again and used the hand gear, and I took the control valve out and started the control valve; it was all right, just the same as when we left the river. When we went ahead with it again, we couldn't do nothing with her. I kept starting the control valve, and I started to move it about, a little bit up and down on the spindle; but it was just the same thing. We would go half speed, and it was all right, but as soon as we got any kind of way on the ship, and the ship started to shake a little, couldn't steer her."

This would indicate that the trouble with the control valve was contemporaneous with the looseness of the steering gear on its base. This is definitely fixed as before the steamer encountered any unusual weather, and before there is any record of unusual weather in the Western hemisphere. The defects in the steering gear were fully developed before there was any trouble with the vessel's fuel tanks. The trouble with the fuel tanks arose some 24 hours after the steering gear had developed serious defects and prevented the vessel from being properly steered and required her to stop. The master of the Turret Crown

did not discontinue the use of the steering gear altogether, but struggled on and then used the hand steering gear. The suggestion that the ship might have been steered by hand is answered by the log entries, showing that it was practically impossible to steer the ship by hand, and there is testimony in the record that the hand steering gear in a modern cargo ship is only an emergency gear, and cannot be used effectively in heavy weather:

[3] Ordinarily a shipowner warrants that his ship is seaworthy in all respects, and not merely that he has used due diligence to make her seaworthy. Of course, the parties may stipulate to the contrary. The warranty is absolute that the ship is, or in fact shall be, seaworthy at the time of engagement, and does not depend on the owner's knowledge or ignorance of his care or negligence. The Edwin I. Morrison, 153 U. S. 199, 14 Sup. Ct. 823, 38 L. Ed. 688. This rule is not affected by the Harter Act (Comp. St. §§ 8029–8035). The Carib Prince, 170 U. S. 655, 18 Sup. Ct. 753, 42 L. Ed. 1181. The exception here is dependent entirely upon the stipulation of such exemption found in the bill of lading.

In the view we take of the evidence, the conclusion is irresistible that the damage to the double bottom tanks of the ship was due to the added strains to which they were subjected by reason of the defective steering gear. In this view of the case, the appellee is liable. Bottom damage to a loaded vessel by heavy weather is rare. Indeed, the record here makes it appear unknown. The damage to the vessel was not confined to the bow, but extended back amidships. Bottom damage is due to pounding, and loaded vessels do not pound. A vessel 20 years old was very old for conversion into an oil burner. If deep tanks had been installed, there would have been an additional factor of safety. The deep tanks would have been constructed of new materials. A deep tank constructed in a vessel already equipped with double bottom tanks would have two bottoms, instead of one. She was disabled, since there was a considerable leakage of water into her double bottom tanks. There is ample expert testimony to the effect that it was not safe or prudent to make this conversion.

It is established that not only is fuel oil much more penetrating, but it is more difficult to contain than water. Double tanks, used as the sole reservoir of fuel oil, constitute a most important part of the ship, and a slight leak in such tanks may be fatal. A similar leak in a water ballast tank would be trifling. Although No. 3 tank was tight, the oil in this tank was contaminated and rendered useless by some leak from No. 2 tank or the pipe connections. It is argued that the double bottom tanks were able safely to pass through time and the ravages of Lake service, but it does apear from the Moore repair bill that repairs were made on the owner's account. The deck log on the voyage from Jacksonville to New York shows that on three successive days water or oil, or both, were in hold No. 1 to a depth of 32, 29, and 31 inches respectively; tank No. 2 showed 39, 44, and 44 inches on three successive days (December 2d, 3d, and 4th); and the soundings on No. 3 never exceeded 1 inch. The bilges of the Turret Crown were 2 feet 3 inches deep. This would indicate that the water or oil in hold No. 1 was from 2 to 4 inches over No. 1 tank top, and from

12 to 17 inches over No. 2 tank top. There is no record of open hatches which might account for rainy weather, and, indeed, the record shows fine and clear weather through the entire voyage from Jacksonville to New York. Even tank No. 3 showed leakage after the repairs to No. 2 had been completed, and it turns out that tanks Nos. 2 and 1 were not tight, and No. 3 tank was.

In any event, the leakage on the voyage here undertaken is sufficiently explained in the hours of straining of the ship, when she became unmanageable because of inability to steer in the weather she encountered. Indeed, the appellee ascribes the cause of the leak to "33 hours of straining in a hurricane with a high, mountainous, following sea," which caused the water to go into the fuel oil on February 27th at 11 a. m. The court below found that the weather encountered was not exceptional, but was what was to be expected on a North Atlantic voyage in February. The strongest wind recorded during the voyage was a strong gale. The log entries show a light wind in the afternoon and at night, the wind rising to a strong breeze in the afternoon and evening of February 25th, a moderate gale in the early morning of February 26th, and fresh to strong gale in the afternoon. The only evidence of exceptional weather on February 26th was the Weather Bureau at Whitehall street, in New York City, where the wind was stated to have a force of 81 miles per hour for five minutes only. No log entry on the ship shows this strong wind. The ship at that time was over 150 miles out to sea. During the three-day period—February 25th to 27th, inclusive—the highest wind velocity recorded in Philadelphia was 36 miles, and that at New Haven 41 miles. These latter records show the unreliability of the New York record as a guide for a ship this distance at sea.

[4] The mere fact that the vessel encountered heavy weather is no defense to the claims for damage to cargoes, if any defect or unseaworthy condition of the vessel existed. The Rosalia (C. C. A.) 264 Fed. 285. The real difficulty with the sea was in the inability to have the vessel under control, owing to her defective steering gear. It is significant that the first mention of seas coming aboard the vessel follows after the entry of trouble with the steering gear in the log. A vessel which is not under control, it is testified, will suffer more from the seas than a vessel which is under control. We see no excuse in the weather.

[5, 6] The appellants further assign as error the refusal below to hold that there was a deviation involved in the steamship's return to New York, and therefore that the ship is not entitled to all the protective clauses in the bills of lading. The ship was obliged to remain in the harbor of New York as indicated by the logs, and later, after proceeding to sea, was obliged to return to Boston for repairs. It was while at sea that much of the roofing paper, the cargo of the Vulcanite Company, was consumed as fuel. "Deviation" has been defined as a voluntary departure, without necessity or any reasonable cause, from the regular or usual course of a voyage. Constable v. Nat. Shipping Co., 154 U. S. 51, 14 Sup. Ct. 1062, 38 L. Ed. 903; Hostetter v. Park, 137 U. S. 30, 11 Sup. Ct. 1, 34 L. Ed. 568. The Supreme Court has pointed out that it is the settled rule in our courts that in

matters of commercial law our decisions should conform to the English decisions, in the absence of some rule of public policy which would forbid. The Eliza Lines, 199 U. S. 119, 26 Sup. Ct. 8, 50 L. Ed. 115, 4 Ann. Cas. 406. In The William J. Quillan, 180 Fed. 681, 103 C. C. A. 647, this court said:

"The conclusion arrived at by the highest courts of the greatest commercial nation in the world ought to have weight everywhere."

The English rule is announced by the House of Lords in Kish v. Taylor, [1912] Appeal Cases, 604, as follows:

"Is it the presence of the peril and not its cause which determines the character of the deviation, or must the master of every ship be left in this dilemma, that whenever by his own culpable act or a breach of contract by his owner, he finds his ship in a perilous position, he must continue on his voyage at all hazards, or only seek safety under the penalty of forfeiting the contract of affreightment? Nothing could, it would appear to me, tend more to increase the dangers to which life and property are exposed at sea than to hold that the law of England obliged the master of a merchant ship to choose between such alternatives. * * * On the whole, therefore, I am of opinion that a master, whose ship is, from whatever cause, in a perilous position, does right in making such a deviation from the voyage as is necessary to save his ship and the lives of his crew, and that while the right to recover damages from all breaches of contract, and all wrongful acts committed either by himself or by the owners of his ship, is preserved to those who are thereby wronged or injured, the contract of affreightment is not put an end to by such a deviation, nor are the rights of the owners under it lost."

See, also, Joseph Thorley, Ld., v. Orchis S. S. Co., [1907] K. B. 660, 12 Asp. Maritime Cases, 217. This rule was stated with approval by the Circuit Court of Appeals of the Fourth Circuit in The Turret Crown, 284 Fed. 439. We do not regard the facts referred to as warranting the conclusion that there was a deviation of the voyage. Therefore the provisions of the bills of lading are effective.

[7-10] The appellee seeks the benefits of appellants' insurance under the clauses of the bill of lading. The American policies which were issued to the cargo owners provided as follows:

"Warranted by the assured free from any liability for merchandise in the possession of any carrier or other bailee, who may be liable for any loss or damage thereto, and for merchandise shipped under a bill of lading containing a stipulation that the carrier may have the benefit of any insurance thereon.

"This insurance is warranted to be in all cases null and void to the extent of any insurance by any carrier or bailee which would attach and cover said property if this certificate had not been issued and to be null and void, as concerns loss or damage by fire on land, to the extent of any insurance against loss or damage by fire directly or indirectly covering upon the same property whether prior or subsequent hereto in date or of the same date herewith, anything hereinbefore contained to the contrary notwithstanding; and it is also understood and agreed that in case any agreement shall have been or shall be made or accepted by the insured with any carrier or bailee by which it is stipulated or agreed that such or any carrier or bailee shall have, in case of any loss for which he may be liable, the benefit of this insurance, or exemption in any manner from responsibility grounded on the fact of this insurance, then and in that event the assurers shall be discharged of any liability for such loss hereunder, but these assurers, in these and all cases of loss or damage by perils insured against shall be liable and owe actual payment for only what cannot be collected from the carrier, bailee, and/or other insurers of property lost or damaged, but also shall be chargeable with the direct pecuniary consequence to the assured temporarily arising from delay in collection from

said carrier and/or bailee and/or insurers, and the advancing for this purpose only, of funds to the assured for his protection pending such delay, shall in no case be considered as affecting the question of the final liability of these assurers, and as soon as collection is made from the carrier, bailee, and/or insurers, the rights of the assured to hold the sums so advanced by these assurers shall discontinue and a portion thereof equal to the sum collected from such carrier, bailee, and/or insurers, shall be repaid to these assurers, but in case of final failure to collect from such carrier, bailee and/or other insurers a portion of the sums advanced by these assurers, equal to the sum short collected from such carrier, bailee and/or other insurers, may be retained and applied in settlement of the actual liability of these assurers thereby established (provided always the loss shall constitute in other respects a claim under this insurance). In the event of loss or damage, this insurance shall be null and void in the extent of any payment made by any carrier, bailee or other insurers whether liable or not."

The bill of lading contains a clause reading:

"* * * The carrier shall be entitled to the benefit of any insurance on the goods and to any payments made by or on behalf of the insurers thereof, whether under the guise of advances, loans or otherwise. * * *"

The insurer is subrogated to the rights of the shipper against the carrier, in the absence of anything to the contrary contained in the bill of lading. But, ordinarily, if the bill of lading gives the carrier the benefit of the shipper's insurance, the insurer is not subrogated. Phœnix Ins. Co. v. Erie & Western Transp. Co., 117 U. S. 312, 6 Sup. Ct. 750, 29 L. Ed. 873. Where a policy is void by agreement if the insured makes a covenant to give the benefit of his insurance to the carrier, the insurers can require the assured to sue the carrier first and can decline to indemnify him until the carrier's liability is determined. Inman v. So. Carolina Ry. Co., 129 U. S. 128, 9 Sup. Ct. 249, 32 L. Ed. 612. Under the clause of the bill of lading above referred to, providing "whether under the guise of advances, loans or otherwise," the parties here have sought to avoid the rule of Luckenbach v. McCahan Sugar Ref. Co., 248 U. S. 139, 39 Sup. Ct. 53, 63 L. Ed. 170, 1 A. L. R. 1522. There it was arranged that, as between the insurers and the shipper, the former loaned to the latter the amount of the loss caused by the shipper's negligence, to be repaid only in so far as the shipper recovered from the carrier, otherwise to operate in effect as absolute payment under the policy, and where, as security, the shipper pledged such prospective recovery and the bills of lading and agreed to prosecute the suit against the carrier at the expense and under the exclusive direction and control of the insurers, it was held that the loan was not a payment of insurance and the carrier was not entitled to the benefit of it, and that a libel brought in the shipper's name for the benefit of the insurers, pursuant to the agreement, could be maintained against the carrier and the ship. This new phrase, as used in this bill of lading, was intended to give the carrier indirectly an exemption from liability for which he could not stipulate directly. If the policy provided there should be no liability in case the shipper had agreed to give the benefit of it to the carrier, it could not be sustained. In Inman v. South Carolina Ry. Co., 129 U. S. at pages 139, 140, 9 Sup. Ct. 252, 32 L. Ed. 612, the court said:

"If this bill of lading had contained a provision that the railroad company would not be liable unless the owners should insure for its benefit, such provi-

sion could not be sustained; for that would be to allow the carrier to decline the discharge of its duties and obligations as such, unless furnished with indemnity against the consequences of failure of such discharge. Refusal by the owners to enter into a contract so worded would furnish no defense to an action to compel the company to carry, and submission to such a requisition would be presumed to be the result of duress of circumstances, and not binding."

In The Hadji (C. C.) 20 Fed. 875, the provision in the bill of lading was "no damage that can be insured against will be paid for." There Judge Wallace held that this clause was void as tending to give the carrier indirectly an exemption from liability for which he could not stipulate directly. The effort in the instant case requires the shipper either to take out insurance which will benefit the carrier or to go without insurance. That kind of stipulation the carrier cannot insist on. In Bradley v. Lehigh Valley R. R. Co., 153 Fed. 350, 82 C. C. A. 426, this court said:

"The same reasons which forbid the enforcement of a stipulation requiring the shipper to insure for the benefit of the carrier would forbid the enforcement of one requiring him when he does effect insurance to procure such as will protect the carrier. The shipper cannot be circumscribed in his liberty to make such a contract with the insurer as he chooses. If he sees fit to make one which may be worthless to the carrier, it is his right to do so."

The American policies referred to in this record rendered them void in case the goods insured were carried under a bill of lading in which the carrier stipulated for the benefit of the shipper's insurance, and the payments made as a loan, with the form of receipt used, do not inure to the benefit of the appellee. Penn. R. R. Co. v. Burr, 130 Fed. 847, 65 C. C. A. 331; Bradley v. Lehigh Valley R. R. Co., supra; Luckenbach v. McCahan Sugar Ref. Co., supra. We think the parties, by their stipulation in the language used, have not avoided the result in Luckenbach v. McCahan Sugar Refining Co., supra, and therefore the carrier is not entitled to the benefit of the insurance. Some of the underwriters did not take formal loan receipts for some of the payments which they made, but this was not necessary. We find that the underwriters did not intend to waive their rights against the carrier. No payments were made until suit had actually been begun against the carrier, and it appears that counsel retained in these suits were retained jointly on behalf of the shippers and their underwriters. This is all inconsistent with an intent on the part of the underwriters to acquiesce in any arrangement whereby their rights of subrogation against the carrier should be lost. In Inman v. South Carolina Ry. Co., 129 U. S. 128, 9 Sup. Ct. 249, 32 L. Ed. 612, it was said:

"By its terms the plaintiffs were not compelled to insure for the benefit of the railroad company; but if they had insurance at the time of the loss, which they could make available to the carrier, or which, before bringing suit against the company, they had collected, without condition, then, if they had wrongfully refused to allow the carrier the benefit of the insurance, such a counterclaim might be sustained, but otherwise not."

See, also, Phœnix Ins. Co. v. Erie & Western Transp. Co., 117 U. S. 312, 6 Sup. Ct. 750, 29 L. Ed. 873.

We think the carrier can derive no benefit from the payments made here after suit brought, and this applies as well to the moneys paid

where no loan receipts were taken. It appears that none of the losses were paid in full.

[11] It is argued by the appellee that the Vulcanite Company sued for $125,000, and it cannot recover if the insurance payments which it received aggregated this amount. If that appellant has been paid a part of its loss, the amount claimed in the libel is presumed to be the amount for which it has not received payment.

[12] It appears that the payments were made by the British, French, and Italian underwriters. All the American insurance policies contained a clause rendering it void if the assured entered into an agreement that the carrier should have the benefit of this insurance. The British insurance policies contain the following clause:

"The seaworthiness of the vessel as between the assured and the assurers is hereby admitted."

In the absence of this admission of seaworthiness, underwriters would have been under no liability, as their policies would have been void, because of breach of the implied warranty of seaworthiness which exists in every policy of marine insurance. Arnould on Marine Insurance (9th Ed.) vol. 2, § 689, p. 575. The phrase "as between the assured and the assurers" prevented the carrier from taking any benefit from the admission of seaworthiness. The words must be taken in their true meaning. The shipper and his underwriter are at liberty to exclude the carrier from any participation in the insurance. The underwriter may provide with the shipper that if the vessel is unseaworthy he will protect him, but not release the carrier. The British insurance is paid under the loan receipt, and there is no waiver of the underwriter's claim against the carrier.

[13] It was provided by stipulation in the record that:

"No information is available in this country as to the form of policy under which the French or Italian insurance was written. If the French and Italian underwriters had paid the same proportion of the loss paid by the American and British underwriters, the amount due from them would have been $60,-473.23, but they have in fact paid only $11,300.90."

It thus appears that there was no information available on the subject at the time of the trial in the United States. The burden of proof under the circumstances rested upon the claimant, who seeks to establish that this insurance was of such a character as to inure to its benefit. It appears that the French and Italian underwriters have paid only a small part of the proportion due from them under the adjustment made with the British and American underwriters. After the rendition of this decision, unless the parties otherwise agree, it will be necessary for a commissioner to consider the question of damages. At such time, the policies in question may be available, and considered by the commissioner.

[14] At the trial, the Vulcanite Roofing Company sought to increase the ad damnum clause in the libel from $125,000 to $375,000. This was denied. The clause in the bill of lading required filing a claim before the removal of the goods from the wharf, and further that no employee or agent had the authority to waive the requirements of this clause. The suit was in rem. A stipulation of value was given

in the sum of $100,000 and the ship released. No notice was given prior to the removal of the goods in Genoa. The reason given for the application to amend is that it was discovered, when the ship discharged her cargo in Italy, after she sailed from New York the second time, and after a bond was given in the amount required by the appellant's proctors, that the loss was in the larger sum. It is shown that said appellant had no opportunity of investigating the damage to the cargo on the second voyage, or to find out what, if any, damage actually existed in the cargo when the vessel arrived in Italy. The vessel's cargo was delivered on August 3, 1918. The loss is alleged to have been caused by reason of the fact that in its damaged condition, difficulties were encountered in the disposing of it, and that it was shortly before the trial that the appellants received final advices showing the true amount of the loss.

We agree with the court below that no decree against the appellee in personam for any excess in amount of the bond should be decreed. As above stated, we find there has been no deviation of the voyage, and part of the loss has been covered by insurance. Considering these factors, and applying the rule that the granting or refusal of the amendment is discretionary with the trial judge, we think no error can successfully be claimed in respect to his ruling on the question of this amendment. The Wildenfels, 161 Fed. 864, 89 C. C. A. 58. In addition thereto, in a suit in personam commenced by the appellant in the Fourth circuit (Vulcanite Co. v. Commonwealth S. S. Co., 284 Fed. 439), it was held that this appellant could not sustain a suit for $275,000, filed two years after. There it was pointed out that the claim was based, not upon loss sustained after the reports were complete and the voyage begun the second time, but were based upon the claim that the full extent of the damage was not discoverable at the time of the first suit. It was held that the carrier had the right to rely upon the terms of the notice given as embracing in entirety the extent of the claim, and that the return of the vessel was not an unjustifiable deviation depriving the carrier of the benefit of the provisions of the bill of lading contract limiting the time for filing claims. We think it was not error to deny the motion to amend.

For the reasons assigned, the District Court is directed to enter a decree in conformity with this opinion.

Decree reversed.

ROGERS, Circuit Judge (concurring). I concur in the result. This I do because of the survey made at Salina Cruz, Mexico, on October 16, 1917, which fully informed the parties responsible as to the condition of the steering gear of the vessel. The recommendations made were not complied with, and in my opinion the difficulties subsequently complained of may be traced to that failure. Another survey was made in New York on February 5, 1918. The report of that survey had attached to it a copy of the report of the survey at Salina Cruz, so that attention was once more called to the matter.

But the Turret Crown commenced her voyage on February 19, 1918, with her steering gear in an improper condition, and after full and sufficient notice of that condition had been given and disregarded. The court below relied upon the opinion expressed by Admiral Knight's

"Modern Seamanship," but that distinguished authority stands unsupported by a single other writer on the same subject, and I am unwilling to decide this case upon his authority in view of what the testimony in this case discloses. The claimant did not, in my opinion, exercise due diligence with respect to the steering gear.

MAYER, Circuit Judge (concurring). I agree with the views expressed by the learned District Court in respect of the exercise of due diligence in relation to the tanks. I think, also, that the testimony shows beyond question, as found below, that in respect of the steam and hand steering gear the vessel was unseaworthy, and prior to the voyage there was the fullest knowledge developed by the survey at Salina Cruz as to the seriously defective condition of the steering gear.

The District Court found that "the breaking down of the steering gear, instead of increasing, decreased the strain upon the vessel," and, in respect of this and other relevant questions of seamanship it adopted the views of Admiral Knight in his work entitled, "Modern Seamanship," 7th edition. Where there is a controverted expert question, we can be guided only by the testimony as it impresses us, and we may, of course, resort to standard works to assist us in arriving at a conclusion. We cannot know in a case of this character which is the correct theory, and, as is always the case, our decision must go in the direction where the more impressive testimony lies.

Qualified men, some of long practical experience, were examined by both sides, and I think it is fair to say that there is substantial agreement among them in opposition to the views of even so distinguished an authority as Admiral Knight. It will be noted that Admiral Knight first points out the conventional way of handling a steamer in the circumstances, and then states, in effect, that the opinion to the contrary is gaining ground. He also stated that he had collected the views of 40 prominent shipmasters, and it appears that there is not unanimity among them as to the precise way in which to handle a vessel under the circumstances instanced. Thus the question is controversial, and I feel that the evidence on this record supports the contention of libelants as to the effect which proximately resulted from this unseaworthy condition of the steering gear.

This is my point of departure from the views entertained by the learned and highly experienced judge who tried this cause, and it is for this reason that I think the decree below should be reversed.

I concur in the result.

On Application for Reargument.

PER CURIAM. This court has held that the Turret Crown was unseaworthy. Her owners are responsible for all damages resulting from such unseaworthy condition. The usual procedure is to refer the case to a commissioner to determine the amount of the damages which the libelants have sustained by reason of the unseaworthiness of the vessel. It should be followed here. There it may be established what are the damages. It may appear that no damages were sustained

by some or all of the appellants, Carlo Repetto, Giobatto Sacco and Luigi Palmieri, copartners, etc., and J. Aron & Co., Inc. In that event, it would follow that the libels, or some of them, would be dismissed. In view of the stipulation in the record that there was some damage to each of the shipments in respect to which the libels are filed, we regard the question of damages as one for a commissioner's determination in the first instance.

The application for a reargument is denied.