### THE J. L. LUCKENBACH.

## CALIFORNIA VICTOR DISTRIBUTING CO. v. LUCKENBACH S. S. CO., Inc.

District Court, S. D. New York.

Nov. 9, 1932.

Single & Hill, of New York City (Robert E. Hill, C. Welmore Robinson, and Loring R. Lecraw, all of New York City, of counsel), for libelant.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (Leslie De Grove Potter and John J. Heckman, both of New York City, of counsel), for respondent.

To the Honorable the Judges of the United States District Court for the Southern District of New York.

JOHN W. CRANDALL, Special Commissioner.

On May 27, 1931, an order was entered herein referring this cause to me as Special Commissioner to hear the evidence adduced by the respective parties and to report my findings and conclusions thereon to the court with all convenient speed.

Before the commencement of the hearings the parties took much testimony by deposition, the libelant examining 9 and the respondent 46 witnesses. Hearings began on June 13, 1932, and extended until June 22, 1932. Eight hearings were held and 17 witnesses testified. The libelant offered 10 and the respondent 13 exhibits. At the June 22d hearing the case was summed up by counsel. The principal briefs were submitted on July 5th and reply briefs on August 15th. I have attached to my report findings of fact and conclusions of law in compliance with Admiralty Rule 46½ (28 USCA § 723).

Having considered the evidence and the argument and briefs of counsel I hereby report as follows:

The libelant has brought this suit to recover for damage to a shipment of radio receiving sets, talking machines, and parts. The goods were shipped by the Victor Talk-

ing Machine Company, a division of the Radio Corporation of America, on the steamship J. L. Luckenbach at Philadelphia, on September 15, 1929, and were consigned to the libelant at San Francisco.

The respondent issued a bill of lading acknowledging receipt of the goods in apparent good order and condition, but upon the vessel's arrival at San Francisco they were found to be badly damaged, due principally to contact with salt water.

The libelant contends that the J. L. Luckenbach was unseaworthy when the voyage began. The respondent denies this and asserts that the damage was due to an error of management for which it is exonerated under section 3 of the Harter Act (46 USCA § 192). The respondent also pleads noncompliance with the claim clause in the bill of lading, and claims the benefit of the insurance on the cargo.

The steamship J. L. Luckenbach is a steel twin screw steamer built in 1919. Her length is 448.9 feet, beam 60.2 feet, and depth 37.8 feet, and her registered tonnage is 5,541 net tons. She has 6 cargo compartments with 8 hatches, the No. 7 and No. 8 hatches leading into the No. 5 and No. 6 compartments, respectively. In the testimony the No. 5 and No. 6 compartments are referred to as No. 7 and No. 8, because of the hatch numbers, and I shall designate them likewise. The compartments are divided into shelter decks, 'tween decks and lower hold.

At the time in question the vessel was engaged in the intercoastal trade between Pacific and North Atlantic coast ports. She discharged eastbound cargo at Philadelphia, New York, and Boston, and loaded westbound cargo at Boston, Philadelphia, and New York, all in the order named.

On the particular voyage the vessel, after loading some cargo at Boston, proceeded to Philadelphia where further cargo, including that of the libelant, was loaded. The libelant's goods were stowed in the No. 8 shelter deck, forward of a slat bulkhead, which partitioned off the compartment into two parts, the after part being a special locker where valuable goods were stowed. The No. 8 shelter deck was completely filled up at Philadelphia and the hatch was closed and battened down. The vessel, after loading the remainder of her cargo at New York, sailed from there for the Pacific coast on the evening of September 18th.

The water that damaged the libelant's goods gained access to the No. 8 shelter deck through a hole in a soil pipe which led through the compartment from the firemen's toilet and shower room situated on the port side of the weather deck and above the after part of the No. 8 shelter deck. There were two toilets, two wash basins, and a shower in this room, with drains leading into the soil pipe. Above each toilet was an automatic syphoning tank which was filled with salt water from the sanitary lines of the ship. The water would fill the tank until it reached the top of an inverted automatic syphon, whereupon it would be syphoned out and the tank would then fill up again. This pipe was made of lead ⅛ of an inch thick, and was about 4½ inches in diameter. It ran under the deck head to the port side of the vessel, making a bend at that point and running down the ship's skin inside the cargo battens for several feet to a clapper or nonreturn valve, at which point the drainage from the toilets discharged overboard at about the 36-foot water mark of the vessel. The pipe was inclosed within a wooden casing where it ran through the shelter deck.

At some time or other—the time being in dispute—the soil pipe became clogged and Owens, the deck engineer, tried to clear it with a brass spring wire, without success. Magnusson, the chief officer, and Houghton, the chief engineer, also tried to clear the pipe with a plunger. Upon investigating, they saw that the water was not discharging overboard, although it was passing through the toilets. They therefore concluded that it must be going into the No. 8 shelter deck and at once shut the water off and ordered the door of the wash room closed and bolted.

When the vessel arrived at San Pedro and San Francisco, an examination showed that water had accumulated in the No. 8 shelter deck to a height of between 18 and 20 inches in the forward end. The water had overflown the shelter deck hatchway, which had no coamings, and had entered the lower compartments. It had also entered the No. 7 shelter deck through four holes in the steel bulkhead separating the two shelter decks, had overflowed the hatchway and gone into the 'tween decks and lower hold. There was damage to the cargo in all No. 7 and 8 compartments. The water, coming into contact with a shipment of soda ash stowed in the forward end of No. 8 shelter deck, had dissolved a large part of it, and crystallized soda ash was found generally throughout the compartments mentioned.

At San Francisco the soil pipe was examined and a hole ⅝ths of an inch in diameter was found in it at the point where

the pipe bent to follow down the ship's skin. A section of the pipe containing the hole is in evidence, and there is no doubt that the hole was punched from the inside. It is conceded, in fact, that the pipe was punctured during the efforts made to clear it.

On the ship's arrival at Puget Sound, the No. 7 and 8 scuppers were all found to be clogged.

1. The respondent, having received the libelant's goods in apparent good order and condition, and having delivered them damaged at destination, has, of course, the burden of establishing that such damage was due to causes for which it is not responsible. Clark v. Barnwell, 12 How. 272, 13 L. Ed. 985; The Folmina, 212 U. S. 354, 29 S. Ct. 363, 53 L. Ed. 546, 15 Ann. Cas. 748; The Rosalia, 264 F. 285 (C. C. A. 2); The Warren Adams, 74 F. 413 (C. C. A. 2).

The respondent, claiming that the damage was due to an error of management, relies on section 3 of the Harter Act (46 USCA § 192), which exempts any vessel within the purview of the act, and her owner, from liability for damage or loss resulting from faults or errors in her management, if the owner has exercised due diligence to make the vessel seaworthy and properly manned, equipped, and supplied.

The act of a member of a ship's crew, in punching a hole in a soil pipe after the commencement of the voyage, is clearly an error of management. See Kalbfleisch Corporation v. United States, 53 F.(2d) 867 (D. C. Mass.); The Touraine, 29 Lloyds List Law Rep. 265; The Rodney, 1900 Prob. Div. 112.

The parties differ as to when the pipe was punctured, the libelant claiming that the act occurred at New York, and the respondent contending that it took place after the vessel left New York. The law is settled that an act of this nature occurring before the voyage begins is not one of mismanagement, but is a breach of the owner's warranty of seaworthiness. See The Newport, 7 F. (2d) 452 (C. C. A. 9); Gilchrist Transp. Co. v. Boston Ins. Co. et al., 223 F. 716 (C. C. A. 6); The Manitou (D. C.) 116 F. 60, 65, affirmed 127 F. 554 (C. C. A. 2).

In support of their respective positions both sides have offered much testimony which is in hopeless conflict. The libelant's testimony consists of depositions of eight members of the ship's crew, namely, Dempsey, second assistant engineer, Burson, third assistant, Owens, deck engineer, Muller, quartermaster, Quinn and Geiger, ordinary seamen, Bray, fireman, and Pagani, oiler. The

credibility of these witnesses has been vigorously assailed.

The practice of going into the hostile camp for witnesses has been disapproved in the First Circuit in collision cases (See Palmer et al. v. Merchants' & Miners' Transp. Co. [D. C.] 154 F. 683, 698; The Teaser [D. C.] 217 F. 920, 921), but in The Perry Setzer, 299 F. 586 (C. C. A. 2), a cargo case, Judge A. N. Hand, the trial judge, did not criticize the libelant's counsel for taking the testimony of several members of the schooner's crew. He rejected the testimony, however, principally on grounds of bias. While such testimony should, I think, be scrutinized carefully, it cannot be disregarded unless successfully impeached. The Monticello, 17 Fed. Cas. page 646, No. 9,739.

Briefly, Dempsey and Burson testified that on September 17th, the day before the ship sailed, they saw water running out of a tell-tale hole in the bulkhead of the crossover between the two shaft alleys. (There was a bilge well next to this bulkhead into which water from the No. 8 shelter deck would ultimately run.) Burson said that he saw water coming from this hole again on September 18th. They both stated that they saw it again on the early morning of September 19th, after sailing, and noticed a sign on the engine room board reading "Do not pump No. 7 bilge until further orders from the engineer."

Owens testified that on the morning of September 17th he learned that the soil pipe was clogged and obtained from the storekeeper a piece of brass spring wire about 7 or 8 feet long which he poked down the drain without accomplishing anything; and that on September 18th he went over the ship's side on a Jacob's ladder and tried to clear the pipe from the outside, without success.

Muller said that he rigged up a Jacob's ladder for Owens the day the ship sailed; that he saw Owens over the side of the ship pushing the rod into the pipe; and that he himself took the rod and tried to clear the pipe from the wash room.

The remaining witnesses, Bray, Quinn, and Geiger, said that they saw the wash room flooded with water before the vessel sailed, and Pagani testified that he saw the Jacob's ladder over the side while the ship was at New York.

To offset this testimony, the respondent produced 13 witnesses, including the master, chief officer, chief engineer, first assistant engineer, carpenter, chief steward, storekeeper,

boatswain, and various other crew members; also the port steward, and respondent's superintendent engineer. This testimony is too lengthy to discuss except in a general way. In substance it is that the soil pipe functioned properly at New York and did not become clogged until the vessel was a day or two out of port.

Atkinson, the carpenter, who took the bilge soundings, said that never while the vessel was in New York was more than an inch of water found in the No. 8 bilge, but that after she had been two or three days out he found 15 or 15½ inches in the No. 8 bilge and reported the sounding to Magnusson, the chief officer. The ship's deck log shows no water in the No. 6 (8) hold on September 16th, 17th, 18th, and 19th, but shows a sounding of 15½ inches on September 20th and 10 inches on September 21st and 22d.

Magnusson corroborated the carpenter as to the excessive sounding in the No. 8 bilge, and said that it was reported to him on Friday morning, September 20th; and that while he was investigating to find the source of the trouble, Owens told him that the firemen's toilet was plugged.

Miller, the first assistant, said that on Friday morning he discovered, while performing his duties, that the chief engineer and the chief officer were in the firemen's wash room trying to clear out the drain pipe there.

Houghton, the chief engineer, said that he examined the vessel's steering apparatus, which was near this wash room, once a day, and never saw any water in the wash room before the vessel sailed from New York; that the trouble was discovered on Friday, and then he put up the notice in the engine room that the No. 7 bilge should not be pumped without further orders from him.

Spencer, the chief steward, whose duty it was to inspect the wash room every morning, said that the water was running freely in the toilets before sailing, and that some days out of New York it was reported to him that the toilet was plugged and he saw Owens trying to clear it.

The testimony of Captain Coonan and Lindstrom, the boatswain, bears out that of the other witnesses.

After careful consideration I am of the opinion that the testimony of the libelant's witnesses is not worthy of credence and that the respondent's account of what occurred is the correct one.

Dempsey, it appears, met a Captain Hocken, an investigator for the libelant's proctors, near the pier one evening while the ship was in Philadelphia after her return from the Pacific coast. They spent some time together and Dempsey talked quite freely about the case. About this time Dempsey asked Miller, the first assistant, if he could be paid off at Philadelphia, saying that he did not want to be involved in the investigations about the cargo damage in New York. Although apparently willing enough to go to the office of the libelant's proctors, he refused to see the respondent's proctors at their office and counsel was obliged to make a trip uptown to see him at his hotel. He also refused to let the ship's proctors see the statement he had given to the libelant's proctors, on the ground that it would not be fair. Boyle, the storekeeper, whose testimony is unimpeached, indicated that Dempsey had endeavored to persuade him to join the other members of the crew in testifying against the ship. Dempsey, moreover, had had an argument with the chief engineer, who, he said, insisted that he should work with an injured foot.

Burson's testimony is altogether unreliable on this point, because on cross-examination he flatly contradicted his previous testimony and admitted that he had never seen any water coming from the telltale hole.

Owens signed a statement in San Francisco in October, 1929, in which he said that he ran the wire down the drain the day after the vessel sailed. Boyle testified that Owens came to him when the vessel was about two days out of New York stating that the pipe in question was plugged, and asking him for a piece of wire, which Boyle gave him. Boyle also said that Owens had tried to induce him to go to a lawyer's house, saying that he would be paid for his time and calling him a fool when he refused to do so.

Muller said that he was "mad" at the mate because he failed to give him a half-day's pay that he promised him for work done on the day before he joined the ship. He missed the ship at Philadelphia on the return voyage and asked the respondent's port captain there to give him enough money to take him to New York, but the request was refused and he was obliged to get to New York as best he could, walking part of the way.

Bray was the man who, according to Owens, put him in touch with the libelant's proctors or their investigator, Hocken, and took him out to a cab which had been engaged to take the witnesses up to see coun-

sel. Pagani was a close friend of Owens and he and Quinn and Geiger were in continuous association with the other witnesses, and had ample opportunity to discuss the case with them.

A helpful discussion of testimony of this sort will be found in Judge Hand's opinion in the record in The Perry Setzer.

Whatever may have been the motives of these members of the ship's crew in testifying as they did, the libelant's proctors were within their rights in taking their testimony and there is nothing to indicate any impropriety on their part.

I believe also that the probabilities support the testimony of respondent's witnesses. It is inconceivable to me why, if the soil pipe had become clogged in port and could not be cleared, Mr. Green, the respondent's superintendent engineer, never heard of it. It was his duty to keep the ships in condition and such a situation undoubtedly would have been reported to him at once. Also, Mr. Smith, the port steward, who had charge of the maintenance of the crew's quarters, would, it seems to me, have been apprised of anything wrong in the wash room. He inspected this room on September 18th and found everything apparently in good condition. Both of these men appeared before me and impressed me as being honest witnesses.

I therefore accept the respondent's version of the circumstances and find that the hole was punctured in the pipe after the vessel left New York, probably the next day.

If my finding is wrong the result will be the same, in my opinion, for the libelant's cargo was shipped at Philadelphia, where the No. 8 shelter deck was completely loaded. The voyage therefore, so far as the libelant's goods were concerned, had already commenced when the vessel was at New York, and, if the pipe was punctured at New York, the act would still be classed as an error of management.

The case of The Steel Navigator, 23 F. (2d) 590 (C. C. A. 2) seems conclusive to me. There the vessel was bound on a voyage from Japan to New York via Manila, Batavia, Singapore, and Calcutta by stages. The cargo which was damaged was loaded at Batavia. The ship planned to load latex in the afterpeak at Singapore. This peak had been partly cleaned at Manila but further cleaning at Singapore was necessary. There were two manholes leading to the afterpeak, and, when oil or other liquids were stowed there, the manholes were made watertight by screwing down the manhole covers by bolts and filling any openings with fiber gaskets. The manhole covers were not made fast at Batavia because of the plans to clean the afterpeak further at Singapore. The latex shipment having been canceled, the vessel left Singapore with the afterpeak empty. After loading at Calcutta she was found to be by the head and it was decided to fill her afterpeak with water to restore her trim. The manhole covers were not made fast after the peak was filled, with the result that, when the water in the peak rose above the 'tween deck level, it leaked through into a storage room and from there into the hold, where it damaged the cargo in suit. The court held that the failure to make the manhole covers tight at Calcutta was an error of management for which the ship was excused. See, also, United States v. New York & O. S. S. Co., 216 F. 61 (C. C. A. 2); The Guadelupe, 92 F. 670 (D. C., S. D. N. Y.).

I can see no distinction between the case at bar and The Steel Navigator in the fact that Boston, Philadelphia, and New York, the ship's three loading ports on the Atlantic coast, are near together. I do not believe that May v. Hamburg-Amerikanische Packetfahrt Aktien-Gesellschaft (D. C.) 57 F.(2d) 265, 1931 A. M. C. 1803, means to hold that the covenant of seaworthiness, as to all the cargo on the ship, is determined at the last port of loading. If it does, it would seem to be opposed to The Steel Navigator.

The libelant's proctors are mistaken in saying that, before The Steel Navigator decision, the cases passing upon this point all involved ports of refuge. In United States v. New York & O. S. S. Co., supra, it appears from the printed record that the port of Algiers, where the alleged act of mismanagement occurred, was a regular port of call on the vessel's voyage from New York to Manila.

Reliance is placed on The Willdomino, 300 F. 5 (C. C. A. 3) which adopted the voyage by stages doctrine, originating in England, and held that a ship must either have, at the outset, a sufficient coal supply on hand for the entire voyage or else at each stage must have an adequate supply for that stage. It is argued that The Willdomino conflicts with The Steel Navigator, and that, inasmuch as the former decision was affirmed by the Supreme Court (The Willdomino v. Citro Chemical Co., 272 U. S. 718, 47 S. Ct. 261, 71 L. Ed. 491), such affirmance is equivalent to an approval of the voyage by stages doctrine, and that, therefore, the Supreme Court's decision overrides that in The Steel

Navigator. I do not so understand the Supreme Court's decision. All that the court decided, as I read its decision, was that, where a ship is sent out with a patently insufficient coal supply for the voyage, her officers intending to take her to another port for bunkers with which to complete the voyage, there is a voluntary and inexcusable deviation. This view of The Willdomino decision is supported by the Supreme Court's reference to it in its later decision in The Malcolm Baxter, Jr., 277 U. S. 323, at page 332, 48 S. Ct. 516, 72 L. Ed. 901.

It is therefore my finding that the puncturing of the soil pipe was an error of management for which the respondent should be excused under section 3 of the Harter Act (46 USCA § 192), provided that it has shown compliance with the conditions of that section.

2. The evidence satisfies me that the J. L. Luckenbach was structurally seaworthy and properly manned, equipped, and supplied when the voyage commenced.

It is contended, however, that the respondent did not use due diligence to make the No. 8 shelter deck seaworthy for the carriage of cargo. The libelant charges unseaworthiness in five particulars: (a) That a lead soil pipe was used instead of one constructed of some material such as iron, brass or copper; (b) that the soda ash was stowed too close to the scuppers and blocked them; (c) that the angle bar forming the base of the slat bulkhead had no limber holes; (d) that the inspection of the scuppers was insufficient; (e) that the scuppers were either clogged at the outset or were stopped up by debris washed into them by the water from the soil pipe.

(a) The libelant's expert, Professor James R. Jack of the Massachusetts Institute of Technology, said that in his opinion lead is not a proper material for soil pipes because of the likelihood of its being gnawed by rats or perforated by a hard instrument when clogged. Mr. McGregor, consulting engineer, criticized the use of lead pipes on the ground that they are susceptible to oxidation, crystallization, and to damage through vibration.

The respondent's witnesses Alfred E. Jordon, consulting engineer, and George B. Drake and Charles E. Ross, naval architects, testified in substance that lead is used largely for soil pipes both afloat and ashore; that it is about the best metal that can be used owing to its resistance to vibration and to corrosion or disintegration from the material passing through it; and that in fact it is more expensive than the other metals which might be used. The testimony of Mr. Green is to the same effect. The classification societies appear to have no regulations prohibiting the use of lead soil pipes, and it is clear from the testimony that they are in very general use on ships.

Without disparaging the qualifications of the libelant's witnesses, I do not find their testimony nearly as convincing as that of the respondent's witnesses. Moreover, the precise question was before the court in The Touraine, 29 Lloyds List Law Rep. 265, and the court approved the use of lead soil pipes. See, also, Kalbfleisch Corporation v. United States et al. (D. C.) 53 F.(2d) 867. I consequently think that no fault can be found with the respondent for using such a pipe.

(b) To support the charge that the soda ash was stowed in such a way as to block the scuppers, the libelant relies on the testimony of Espinosa, the ship's fourth officer. Some of his testimony doubtless would create the impression that the soda ash was stowed directly over the scuppers. His testimony as a whole, however, convinces me that he did not really know how the soda ash was stowed but was merely trying to give his opinion as to what may have happened. It seems incredible that experienced stevedores would deliberately stow bags of soda ash, which has about the same consistency as flour, directly over the scuppers, thus rendering them useless. The respondent's testimony, notably that of Moreley, head stevedore at Philadelphia, and Magnusson, chief officer, satisfies me that the soda ash was clear of the scuppers, and I therefore find against the libelant on this charge.

(c), (d), (e). I shall consider the three charges relating to the angle bar, the scuppers, and the condition of the compartment, together.

The No. 8 shelter deck was divided into two parts by a slat bulkhead composed of boards about 6 or 7 inches wide, placed about 2 or 3 inches apart. They were secured to a beam overhead, and at the bottom to a steel angle bar 6 inches high and with a 3-inch flange at the deck. This bar was riveted to the deck and extended across the compartment, following the camber of the deck. It was fitted closely at the sides to strainer angles, which were 4 inches high. On account of a difference of 2 inches in the heights of the bar and the strainer angles, there were spaces about 2 inches high and ½ inch wide between the ends of the bar and

the frames. The deck was composed of overlapping plates and at each overlap under the angle bar there was fitted a tapered steel liner which closed the opening left by the overlapping of the plates. The camber of the deck at the special locker bulkhead was 8 inches and the ship's sheer, on drafts of 24 feet 8 inches forward and 24 feet aft, gave a drop of 15.7 inches from the slat bulkhead to the forward bulkhead. The distance between these points was 36 feet.

There was a 3 inch scupper pipe, equipped with a raised strainer, in each forward corner of the compartment. These pipes led down through the 'tween decks, following the curvature of the ship, into the shaft alleys and thence forward to the after bulkhead of the engine room, going through that bulkhead and discharging into the engine room bilge. The scuppers in the 'tween decks tied into the shelter deck scuppers about 18 inches below the 'tween deck level.

The scuppers from the No. 7 and No. 8 shelter decks were concededly clogged on the vessel's arrival on the Pacific coast, the port scuppers, for some reason, being more badly clogged than the starboard ones. The starboard pipes were cleared with a hose, but it was necessary to cut sections out of the port scuppers in order to clear them. The pipes were taken down at Everett, Wash., the No. 8 pipe being cut out by the ship's force and the No. 7 pipe by employees of the Bayside Iron Works. The stoppage in the No. 8 pipe was found a little below the flange where the 'tween deck scupper joined with the scupper from the shelter deck, about 18 inches below the 'tween deck. The obstruction in the No. 7 pipe was evidently in the lower hold.

The witnesses do not agree as to what was in the No. 8 pipe. Several of the respondent's witnesses said that it was a white crystallized substance, presumably soda ash. But Miller, the first assistant, who, with Burson, third assistant, took down this pipe, and was in the best position to observe what it contained, said that it was clogged with dirt and lint and something resembling crystallized salt or sugar. He saw no paint scrapings in the pipe. Burson said that it was stopped up with chips of dunnage, slivers of wood, pieces of sisal rope, waste, and paint chippings.

I rejected Burson's testimony about his seeing water coming from the telltale hole in the cross-over, because of his patently contradictory statements. But I am not on that account required to disregard all his testimony, if satisfied that some of it is at least partially corroborated.

40 Cyc. p. 2586, states: "As a general rule the fact that a witness has wilfully testified falsely as to a material matter lays him open to suspicion and justifies a jury in rejecting all of his testimony except such part thereof as may be sustained by some evidence in corroboration of his statements; but a jury is not required to do this and may accept such of the witness' testimony as they deem proper notwithstanding his false statements and a court cannot withdraw his evidence from the jury's consideration."

See, also, Quill v. City of New York, 36 App. Div. 476, 55 N. Y. S. 889.

I feel warranted in accepting Burson's testimony as to the stoppage because he was sufficiently corroborated by Miller as far as the dirt and refuse in the pipe is concerned and to some extent by Captain Heppel, the respondent's surveyor at San Francisco, who said that he found the strainers completely choked with dry soda ash but also saw paint grounds in them. Shortly before the vessel left Boston her cargo compartments were painted, following whatever scaling and chipping of the old paint was found necessary.

What was the cause of the clogging of the scuppers? The respondent attributes it to the soda ash, possibly intermingled with dirt and refuse which might be expected to collect in the compartment during the loading of cargo. The libelant argues that the angle bar, without limber holes, obstructed the free passage of drainage to the scuppers; that there must have been a partial obstruction in the scuppers in the beginning, which would have been disclosed had they been properly tested; and that dirt from the preceding voyage and the old paint chippings had not been thoroughly removed from the space.

The respondent's chemical expert, Dr. Foster D. Snell, said that in his opinion there were two possible explanations of the clogging: First, that the water coming into contact with the soda ash would dissolve it, and in the process of dissolution would evolve heat, thus raising the temperature of the water and rendering the soda ash more soluble; that the resulting solution would crystallize when it cooled, and that the cooling process would occur when the solution came into contact with the scupper pipe, the temperature of which would be lower than that of the solution; that crystallization would take place and the pipe would become stopped up, possibly within an hour. Second, that the soda ash solution, being slightly warmed by the heat resulting from the solution, would tend

to attack paint film; that calcium magnesium soaps would be formed by the reaction of the calcium magnesium in the sea water with the soaps formed by reaction between the paint film and the sodium carbonate solution; that the paint, where the solution touched it, would therefore be quite thoroughly disintegrated, and that the paint pigment and flakes of paint film might slough off and be carried along to the scuppers.

Mr. Henry G. Ellege, the libelant's expert, a research chemist for the Diamond Alkali Company, the shipper of this soda ash, expressed views directly opposed to those of Dr. Snell. He testified that soda ash is a commodity comparable to ordinary baking soda or sodium bicarbonate; that when it comes into contact with moving water it will dissolve, form into a solution, and wash away; that it will drain through the meshes of a bag and run down a scupper like water; that he could conceive of no way in which a solution of soda ash and sea water could choke up scupper pipes originally free from obstructions; that such a solution coming into contact with a paint surface would not cause it to peel or chip but would slowly saponify the drying oils in the paint, ultimately making a very thin soluble soap.

The testimony of the employees of the Bayside Iron Works, who took down the No. 7 pipe, that a hard crystalline formation was found in that pipe, lends support to the opinion of Dr. Snell, but I find it unnecessary to choose between the conflicting views of Dr. Snell and Dr. Ellege, because I have concluded that the solution of water and soda ash could not have been the proximate cause of the trouble. I base this conclusion not only upon the fact that considerable debris was found in the No. 8 pipe but upon the views of some of the respondent's witnesses as well.

Captain Heppel's opinion was that the water had washed dirt into the scuppers stopping them up and forcing the water back into the compartment until it reached a sufficient height to come into contact with the soda ash; that it dissolved the soda ash which then accumulated at the strainers; and that the soda ash was not the initial cause of the stoppage. Mr. Drake thought that, if the scupper was originally clear, the soda ash combined with the water would not stop it up. Mr. Ross was of the opinion that the accumulation of water in the space was due to the stoppage of the pipe by dirt or debris, or by the closing of the pipe from its exhaust. Mr. Green also thought that miscellaneous rubbish from the cargo was washed into the scuppers by the water and clogged them.

There were two layers of dunnage, each one inch thick, under the soda ash, the bottom layer running athwartships and the top one fore and aft. Magnusson, the chief officer, said that tarpaulins were placed over and around the soda ash. Under these circumstances I do not see how the water would have had any appreciable effect on the soda ash in the first instance. Aside from possible prior obstructions in the scuppers there very evidently was some debris in the space which the water carried to the scuppers and which stopped them up sufficiently to back the water up until it reached the soda ash. Thus, whatever chemical reactions and results followed the combining of the water and soda ash, the proximate cause of the accumulation of water was the debris in the scuppers.

Paint peelings also were found in the No. 8 port scupper. The question is, how did they get there? Dr. Snell's opinion was that the combination of soda ash and salt water would disintegrate the paint where it touched it, and several of the respondent's witnesses said that the paint on the sides of the compartment was eaten away. But I cannot overlook the testimony of Miller, the first assistant, who said that he saw no paint peelings lying around the compartment after the cargo was discharged, and no evidence that the soda ash had eaten off the paint. Also, McGregor, who examined the compartment in November, 1929, said that the paint had not been eaten away. In view of this testimony I am forced to conclude that the workmen failed to remove the paint chippings thoroughly from the space.

Magnusson and Miller testified that they tested the scuppers at Boston. Magnusson said that he poured a bucket of water down each No. 8 shelter deck scupper and about two buckets down each 'tween deck scupper. No one was stationed at the discharge ends of the scuppers to advise him whether or not the water was coming through freely. He said that he relied on the sound of the water going down the pipe to satisfy himself that nothing was hindering its flow. I do not regard this as a sufficient test. I think that some one should have been placed at the outlets of the scuppers to signal back the results of the test. Moreover, I do not believe that a test with three buckets of water was adequate for scuppers as long as these, leading as they did through the shaft alleys and into the engine room bilge. Suffi-

cient water should have been used, with a hose if necessary, to satisfy a man below that there was a free flow of water through the pipes.

It is argued that, if the port scupper had been obstructed when the test was made, the three buckets of water would have more than filled the pipe from the point of stoppage. This would possibly be true, if the pipe was completely stopped, but the high soundings in the No. 8 bilge on September 20th indicated that the obstruction, if any, was only partial.

The absence of limber holes in the angle bar presents a serious question, for water entering the locker would obviously be dammed up behind the bar. The respondent's proctors say that water would rise to the height of four inches only in the wings due to the spaces between the ends of the bar and the frames. I am not satisfied that these spaces were open on this voyage. McGregor examined the bar in November and found these spaces filled up with a substance appearing to be hard dirt and cement and the respondent made no attempt to refute his testimony.

Conflicting calculations were submitted by the experts to show to what extent the water would be spread over the special locker behind the angle bar. These calculations, assuming an empty space, are of no apparent assistance in a situation, as here, where the locker was filled with cargo.

Had the bar been equipped with limber holes, the water would have continued to flow forward along the side of the compartment. As it was, much of the dammed up water must inevitably have been thrown over the bar by the ship's motion and spread over the forward part of the shelter deck, where the libelant's goods were stowed.

The respondent suggests that dirt would accumulate during the loading of cargo and that the water would carry this dirt to the scuppers and help to choke them up. Incidentally, Cox, the respondent's witness, said that the ordinary amount of debris would not clog the scuppers, if it reached them. At all events, refuse accumulating during loading would gather, I should assume, largely on the dunnage. Whether the top dunnage boards were two or three inches apart or close together, as Moreley, the head stevedore, testified, the water coming over the angle bar and spreading about would gather up this debris (apart from touching the cargo) and carry it to the scuppers. This would not have been so, at least to such an extent, if the water could originally have flowed unhindered to the scuppers.

I doubt whether the small spaces at the ends of the bar, even if open, could have disposed of the dammed up water and have diverted it to the sides of the shelter deck. But if they did, the water would then doubtless have run along the sides directly to the scuppers. If it picked up any debris on the way, that refuse must have been there before the cargo was loaded, for it seems most improbable that any appreciable quantity of refuse could have collected at the extreme sides of the compartment during loading operations.

I think that it was improper to have an angle bar such as this in the shelter deck, unless it was provided with limber holes to secure adequate drainage of any water entering the special locker. While the lead pipe itself was unobjectionable, surely the chance that it might be gnawed through by rats or punctured was not so remote as to justify the respondent in apparently believing that there was no need to give any thought to the question of drainage. Mr. Green said that he disapproved of pipes of any kind in cargo spaces, but that it was necessary to run this pipe through the shelter deck because of its proximity to the crew's quarters. Both Professor Jack and Mr. McGregor testified that the angle bar without limber holes seriously affected the fitness of the space for the safe carriage of cargo and I accept their opinions.

It is argued that scuppers are anyway only intended to care for the ordinary seepage in a compartment, such as sweat and leakage from liquid cargo. It will be observed, however, that the courts, in Secretary of State v. Dreyfus & Co., 8 Lloyds List Law Rep. 92, Micks Lambert & Co. v. U. S. Shipping Board, 16 Lloyds List Law Rep. 277, and The Cornelia (D. C.) 15 F.(2d) 245, did not consider that scuppers were intended to perform such limited functions.

It is further argued that scuppers are not intended to drain off water entering a compartment in quantities through a catastrophe or unanticipated cause. This contention would doubtless hold good in the case of a collision or similar accident. Dreyfus v. Paterson Steamships (D. C.) 59 F.(2d) 824, 1932 A. M. C. 1142. But here the water entered in a 5/8 inch stream and Ross, the respondent's expert, said that 3-inch scuppers should be able to carry off such a volume of water without difficulty.

A carrier's obligation to use due diligence to provide a seaworthy vessel at the inception of the voyage is, of course, not limited

to the structural fitness of the ship, but includes the fitness of her cargo spaces for the carriage of merchandise. See The Southwark, 191 U. S. 1, 15, 24 S. Ct. 1, 48 L. Ed. 65; The Edwin I. Morrison, 153 U. S. 199, 215, 14 S. Ct. 823, 38 L. Ed. 688; The Thomas P. Beal, 11 F.(2d) 49 (C. C. A. 3); The Phoenicia, 90 F. 116 (D. C., S. D. N. Y.).

Counsel have cited several cases, similar in nature to the present one, where the subject of due diligence was passed upon. The libelant relies on The Cornelia, 15 F.(2d) 245 (D. C., S. D. N. Y.); Secretary of State v. Dreyfus & Co., 8 Lloyds List Law Rep. 92; and Micks Lambert & Co. v. U. S. Shipping Board, 16 Lloyds List Law Rep. 277, and the respondent refers to The Touraine, 29 Lloyds List Law Rep. 265. See, also, Kalbfleisch Corp. v. United States et al., 53 F.(2d) 867 (D. C. Mass.)

In Secretary of State v. Dreyfus & Co. water entered a cargo space through a sea peril but could not get out because the scuppers were blocked with debris left in the compartment from the preceding voyage. The court held the carrier liable because the ship was loaded in an unseaworthy condition and said that, if the drains were not clogged from debris left in the space, it must be inferred that they were choked before the vessel sailed.

In Micks Lambert & Co. v. U. S. Shipping Board a soil pipe leading from the vessel's bridge deck space through the 'tween deck cracked at a bend in the pipe in that space. The 'tween deck scuppers were choked with grain which had apparently been swept in there. As a result water accumulated and overflowed the hatch into the hold. The ship was held liable because of her owner's failure to find out that the drains were clogged.

In The Touraine opossum skins were stowed in the ship's strong room near which was the sailors' wash house. A soil pipe led from the wash house through the strong room. Water entered the strong room from a hole in the soil pipe, apparently punched by a sailor. The water evidently picked up refuse in the room which clogged the scuppers. Here the court decided for the carrier saying that it doubted whether the strong room needed any scuppers at all, and, at any rate, it could infer no fault because the scuppers choked up.

In Kalbfleisch Corporation v. United States a shipment of casein stowed in the ship's 'tween deck was damaged by sea water from a punctured discharge pipe leading from the firemen's toilet on the deck above. Bags of quebracho were stowed in the same space and were separated by sawdust to keep them from sticking together. One of the scuppers was found clogged with rust, paint chippings, and sawdust. The court found that the scuppers had been properly inspected and the compartment cleaned, and held that the sawdust, which had been loosened by the water, caused the stoppage.

Cases of this kind, which turn upon questions of fact, cannot necessarily be accepted as precedents.

The case most like the present one is The Cornelia. There sugar was damaged by sea water which entered the bridge deck space through seaworthy doors in the forward bulkhead. A wooden bulkhead was built aft of the sugar and forward of two of the scuppers in the space. Holes had been cut in the bulkhead. These holes, as well as the scuppers, were found plugged at destination and water had accumulated forward of the bulkhead and overflowed the dunnage. The evidence showed that the space had been swept out and the scuppers tested with a wire fall.

The court inferred that the water would not have risen and damaged the sugar, had the scuppers been in proper condition to carry it off, and said [page 248 of 15 F.(2d)]: "Since the scuppers are intended to carry off water, the effective way to test their efficiency is with a hose. This was not done, nor was the bridge deck space washed out before the voyage commenced. From the condition disclosed on the termination of the voyage, the conclusion cannot be avoided that the damage resulted either because the scuppers or the holes in the wooden bulkhead were choked before the voyage was commenced, or became choked during the voyage because of the presence of dirt and other foreign materials left in the cargo space before the cargo was placed therein. In either case it cannot be said that due diligence was exercised to make the ship seaworthy."

The respondent, in my opinion, clearly has failed to sustain the burden of showing that it exercised due diligence at the commencement of the voyage to make the No. 8 shelter deck seaworthy for the carriage of cargo. On the contrary, the proof establishes a lack of due diligence in this respect. The respondent is therefore not entitled to exemption, under section 3 of the Harter Act (46 USCA § 192), from liability for the damage to the libelant's cargo.

Counsel have argued at length the ques-

tion as to whether a causal connection between damage to cargo and a carrier's lack of due diligence to make the vessel seaworthy is necessary in order to deprive the carrier of the benefit of section 3 of the Harter Act. The libelant asserts that a causal connection is unnecessary and the respondent contends that it is. Many authorities, expressing conflicting views on the subject, are cited. But the proof here shows a direct causal connection between the damage to the libelant's goods and the respondent's lack of due diligence, and I therefore find it unnecessary to consider this vexing question.

A further point has been made about the holes in the bulkhead separating the No. 7 and No. 8 shelter decks and the question has been argued as to whether that bulkhead should have been water tight. The instant case, however, only concerns cargo in the No. 8 compartment, and hence the point is not material.

3. The respondent next argues that the libelant has failed to comply with clause 22 of the bill of lading providing for the making of claims for damage.

The clause, which for convenience I have separated into two sections, reads in part as follows:

"22. (a) Shall make all claims for damage to cargo, * * * fully disclosing the nature and extent thereof in the presence of the captain and/or agent of this company and/or the delivering carrier at destination before the cargo is removed from the carrier's custody or final receipts signed. (b) Unless written demand for payment of claims for damage * * * shall be made upon the carrier liable therefor, or upon the carrier that actually delivered the goods, within ten (10) days after delivery, all claims for damage of whatsoever nature and extent shall be taken to have been waived. * * * "

If there are any ambiguities or provisions of doubtful meaning in this clause—and to my mind there are several—they should be construed most strongly against the respondent which drafted it. Gelderman v. Dollar S. S. Lines, Limited, 41 F.(2d) 398 (D. C., E. D. N. Y.).

The two parts of the clause, as previously designated, will be considered separately.

(a) The stipulation as to the making of claims does not provide that they shall be in writing. Therefore a verbal claim would be sufficient. The Vallescura (D. C.) 43 F. (2d) 247, 1929 A. M. C. 1409; Fiorita & Amoroso v. Cunard S. S. Co., 10 F.(2d) 244 (D. C., S. D. N. Y.).

The clause stipulates that the nature and the extent of the damage shall be fully disclosed in the presence of the captain and/or agent of the company before the removal of the goods, etc. Provisions of this nature must be construed in the light of reason (Queen of the Pacific, 180 U. S. 49, 21 S. Ct. 278, 45 L. Ed. 419), and I do not regard this stipulation as reasonable under the circumstances of the present case. It is indeed conceded that the clause should be construed as making only a reasonable demand upon the consignee. The respondent knew the nature of the damage before the libelant's goods were removed from the pier. Its surveyor, Heppel, made an extensive examination of the damaged cargo on the ship and on the dock at San Francisco, and tried to estimate the extent of the damage. He also had discussions with the various consignees on the dock. The libelant's goods consisted of radio receiving sets and parts and even after they had been delivered at the consignee's warehouse, no agreement could be reached as to the extent of the damage, and it was necessary to return some of the sets to the factory at Camden for repairs. This was done with the respondent's approval. The unreasonableness of the stipulation seems clear under these circumstances.

The provision is not definite as to where claims shall be made. The words "at destination" do appear after "delivering carrier," but there is no comma after "carrier." These words evidently refer to the delivering carrier as distinguished from a prior carrier. Whether they were also meant to include the master and the respondent's agent is not clear. At any rate, in the absence of a specific requirement that claims must be made to the master or ship's agent, and at destination only, I do not feel justified in construing the clause to limit the making of claims to that point.

The clause also provides that claims must be made before removal of the goods from the carrier's custody or the signing of final receipts. It does not specifically cover a situation where the cargo is delivered in two lots and two receipts are signed, as here. It is not clear whether the time of the last receipt was intended to constitute the limit for both lots or whether a separate time limit was intended for each lot. According to the Century Dictionary the word "final" means "ultimate" or "last" and I should therefore say that the final receipt would be the last receipt signed for any part of the cargo, and that a claim made before such receipt was signed would be in time.

It is my opinion that the clause (part a) is valid in so far as it provides that claims shall be made before the removal of the goods from the carrier's custody or the signature of the final receipts. See The Persiana, 185 F. 396 (C. C. A. 2); The San Guglielmo, 249 F. 588 (C. C. A. 2); Unione Austriaca di Navigazione, of Trieste, Austria, et al. v. Leon G. Tujague & Co. et al., 231 F. 427 (C. C. A. 5); The St. Hubert, 107 F. 727 (C. C. A. 3); The Westminster, 127 F. 680 (C. C. A. 3). I cannot agree with the contention that the clause is merely directory, and that in the absence of a penalty provided therein no consequences would flow from a failure to make a claim within the time provided. In the Cherca, 55 F.(2d) 926 (C. C. A. 2), the clause simply stated that a notice of claim should be given within 48 hours after landing of or failure to deliver the goods, and the court dismissed the libel because of the libelant's failure to comply therewith. See, also, The Vallescura, supra.

The burden is upon the libelant to prove compliance with the clause, so far as valid. Cudahy Packing Co. v. Munson S. S. Line, 22 F.(2d) 898 (C. C. A. 2); The General G. W. Goethals, 298 F. 935 (C. C. A. 2); The Westminster, supra. It has sustained this burden in my opinion. Its goods were removed from the pier in two lots, the first lot on October 9, 1929, and the second on October 10th. The receipt for the last lot was signed on October 10th at about 2:30 p. m., the time being stamped on the back of the receipt. A claim made on October 10th, before 2:30 p. m. Pacific Standard Time, would therefore be within the time limit of the clause as I have construed it.

Mr. Lawson, of the shipper's insurance brokers in Philadelphia, testified that in the morning of October 10, 1929, Mr. Wagle of the Phœnix Assurance Company, Limited, which had insured the goods, telephoned him requesting him to communicate immediately with the Radio Corporation of America, with respect to the damaged cargo; that he at once telephoned Mr. Spellman of the R. C. A. Victor Company, in Camden, N. J., and in the course of the conversation advised him to be sure and notify the respondent that it would be held responsible for the damage.

Mr. Spellman corroborated Mr. Lawson as to the conversation and said that he immediately telephoned Mr. Garrow, the respondent's district manager in Philadelphia, asking him for particulars as to the shipment and informing him that the Victor Company was going to hold the respondent responsible for the claim. This testimony is uncontradicted and establishes the making of a verbal claim for damage on the respondent on the morning of October 10th, which was in time, as Pacific Standard Time is three hours behind Eastern Standard Time.

There is also testimony sufficient, I think, to justify a finding that the libelant made a written claim at San Francisco before the time expired. Mr. Skerten, the libelant's secretary, located at its San Francisco office, testified that he dictated and signed a formal claim on October 9, 1929, in the morning; that immediately afterward he gave it to the mailing clerk, with instructions that it was to be mailed at once; that the customary office procedure was that all mail was mailed on the day that it was dictated, without fail. The mailing clerk was not called as a witness, so there is no testimony that the letter was actually deposited in a letter box. This is not a case, however, where there is an issue as to whether the letter was received, for the respondent received it, and answered it on Saturday, October 12th, denying all liability for the damage. Both letters are in evidence. No receipt date was stamped on the libelant's letter and the respondent's letter does not state when it was received.

Counsel have submitted numerous authorities as to what constitutes proper proof of mailing. The cases are in conflict, some courts holding that proof of actual deposit in a letter box is necessary, and others that it is not. The respondent's proctors cite, among others, the case of United States v. Rice, 281 F. 326 (D. C., S. D. Tex.) and Gardam & Sons v. Batterson, 198 N. Y. 175, 91 N. E. 371, 139 Am. St. Rep. 806, 19 Ann. Cas. 649, while the libelant's proctors rely upon Swampscott Mach. Co. v. Rice, 159 Mass. 404, 34 N. E. 520; Prudential Trust Co. v. Hayes, 247 Mass. 311, 142 N. E. 73; Smith v. F. W. Heitman Co., 44 Tex. Civ. App. 358, 98 S. W. 1074. See, also, Citizens' Bank & Trust Co. of Middlesboro, Ky. v. Allen, 43 F.(2d) 549 (C. C. A. 4).

In Swampscott Mach. Co. v. Rice, supra, Judge (later Mr. Justice) Holmes, referring to the letter in question, said: "The plaintiff's bookkeeper received it at the date of the maturity of the note, and at once put it into a box in the office, stamped, and with a direction for return if not delivered in five days. It was the regular course of business for an office boy to carry the letters from this box to the post office. The letter never was returned. This was evidence that the notice was sent and received."

The case of Citizens' Bank & Trust Co. of Middlesboro, Ky. v. Allen, supra, is substantially to the same effect.

The cases cited by the respondent are at common law, and so too, are those of the libelant. But admiralty has less strict rules of evidence. As Judge Benedict said in the J. F. Spencer, 3 Ben. 337, Fed. Cas. No. 7,315: "Courts of admiralty are not bound by all the rules of evidence which are applied in the courts of common law, and they may, where justice requires it, take notice of matters not strictly proved." See, also, The Rosalia (C. C. A.) 264 F. 285; The Boskenna Bay (D. C.) 22 F. 662; Benedict on Admiralty, vol. I (5th Ed.) § 381. Although the New York state decisions seem to support the respondent, they are not binding on an admiralty court, as the Conformity Act, 28 USCA § 724, excludes admiralty causes. Clarke S. S. Co. v. Munson S. S. Line (D. C.) 59 F.(2d) 423, at page 428. I think that the libelant has sufficiently proven that the letter was mailed on October 9th.

It is contended that there is no evidence that the letter was received on October 10th. It was mailed and received in San Francisco, and under such circumstances, the rule applied by the Supreme Court of New Jersey in Alexander v. Rekoon, 104 N. J. Law, 1, 139 A. 796, appeals to me as a reasonable one. The court said (page 797 of 139 A., 104 N. J. Law, 1): "Where a letter is mailed in the place in which the party to whom it is directed resides, and it is received by him, it may reasonably be inferred that he received it in due course of mail, that is, in the present case, where a letter is delivered at the place to which it is addressed, either the day of its mailing or the day following. * * *"

The respondent received and produced the letter but did not deny that it was received on October 10th. The inference therefore seems proper that it was received on that day in the ordinary course of mail.

(b) It is claimed that the libelant failed to comply with clause 22 (part b), providing that written demand for payment of claims shall be made within ten days after delivery. I do not understand the purpose of this provision. The ordinary requirement for the making of claims within a certain time is placed in a bill of lading so that the carrier may have prompt notice thereof and make investigations of the damage. As was said in Georgia, Florida, & Alabama R. Co. v. Blish Milling Co., 241 U. S. 190, page 196, 36 S. Ct. 541, 544, 60 L. Ed. 948, "The

purpose of the stipulation is not to escape liability, but to facilitate prompt investigation." The claim made by the libelant under part (a) of clause 22 put the respondent on notice and I cannot see what additional benefit the respondent would derive from a mere demand for payment within 10 days. The libelant's damages were not then liquidated anyway, so that, if it had demanded payment within ten days, such demand would have been for a sum bearing no relation to its actual damages; a meaningless proceeding from the standpoint of all concerned. In my opinion part (b) is unreasonable as being practically impossible of satisfactory fulfillment in most cases; certainly in the present case.

If my view of part (b) is incorrect I think that substantial compliance therewith has been shown, in any event. Mr. Wagle of the Phœnix Assurance Company, Limited, wrote a letter to the respondent in New York City on October 10, 1929, the second paragraph of which reads as follows: "We hereby file formal claim upon you for all loss or damage to our assured's shipment per your vessel on their behalf or for account of whom it may concern."

This letter was received on October 11th.

In Georgia, Florida, & Alabama Railway Company v. Blish Milling Company, supra, Mr. Justice Hughes, referring to the carrier's claim clause, said (p. 198 of 241 U. S., 36 S. Ct. 541, 545): "Granting that the stipulation is applicable and valid, it does not require documents in a particular form. It is addressed to a practical exigency and it is to be construed in a practical way."

Here the underwriter's letter was not expressly a demand for payment, but it was near enough to it, I think, to comply with clause 22 (part b) if valid.

The point is made that the underwriter was not shown to be authorized to make this claim and that consequently it was ineffectual. Clause 22 does not specify who shall make claims, but aside from that fact the interest of the insurer fully appears in the record, and · the respondent, having itself made the fact of insurance relevant by claiming the benefit thereof, is hardly in a position to question the underwriter's authority. See Kohler & Chase v. United American Lines (D. C.) 60 F.(2d) 530, 536, 1932 A. M. C. 1018, at page 1026.

Lastly, I think that the respondent has waived compliance with clause 22 (part b) if valid. The delivery of the libelant's goods

was completed on October 10th and it had until October 20th within which to demand payment. On October 12th, the respondent, in answering the libelant's letter of October 9th, denied all liability for the damage. In Oelbermann et al. v. Toyo Kisen Kabushiki Kaisha, 3 F.(2d) 5 (C. C. A. 9) the consignee filed a claim for damage after the expiration of the required time, and the carrier rejected it solely on the ground that it was not liable. The court held that the carrier's letter was a waiver of its defense under the clause. A different result was reached in this circuit in W. R. Grace & Co. v. Panama R. Co. (C. C. A.) 12 F.(2d) 338, where the court held that a letter disclaiming responsibility could not constitute a waiver after the time had expired. The court, however, left open the question as to what would be the effect of an implied consent to forego the claim clause made before the time had expired. Here the respondent's letter denying liability was written eight days before the time expired. As I see it, the letter was, in effect, a representation to the libelant that a demand for payment would be unnecessary and therefore was a waiver of compliance with clause · 22 (part b).

4. The respondent, finally, claims the benefit of any insurance effected on the goods, under clause 18 of the bill of lading reading as follows: "In case of any loss and damage for which the carrier shall be liable, the carrier shall, to the extent of such liability, have the full benefit of any insurance that may have been effected upon the goods or against said loss or damage, and as well also of any payment to insured by underwriters repayable only out of recovery against the carrier, notwithstanding the underwriters are not obligated to make such payment."

The policy of insurance issued by Phœnix Assurance Company, Limited, contained a provision reading in part as follows:

" * * * It is also understood and agreed, that in case any agreement be made or accepted by the assured with any carrier or bailee by which it is stipulated that such or any carrier or bailee shall have, in case of any loss for which he may be liable, the benefit of this insurance, or exemption in any manner from responsibility grounded on the fact of this insurance, then and in that event the insurers shall be discharged of any liability for such loss hereunder. * * * "

The assured received from its underwriter the sum of $6,679.75 under a receipt providing that the money was received as a loan

repayable only out of any net recovery the assured might make from any carrier on account of damage to the insured cargo. The assured pledged to the underwriter all claims and recoveries thereon as security for repayment. This loan receipt is substantially the same as the one before the Supreme Court in Luckenbach v. W. J. McCahan Sugar Ref. Co., 248 U. S. 139, 39 S. Ct. 53, 63 L. Ed. 170, 1 A. L. R. 1522. There the court held that the advancement of the money by the underwriter to the assured in the form of a loan was a lawful arrangement and did not constitute a payment of the insurance to which the carrier was entitled to the benefit.

The respondent's clause is broader than the one in Luckenbach v. W. J. McCahan Sugar Ref. Co., but no broader than the one in The Turret Crown, 297 F. 766, 778 (C. C. A. 2) which provided that " ᵓ * ᶜ the carrier shall be entitled to the benefit of any insurance on the goods and to any payments made by or on behalf of the insurers thereof, whether under the guise of advances, loans or otherwise. * * * " The court said that this new phrase was intended to give the carrier indirectly an exemption from liability for which it could not stipulate directly and that the use of this language did not avoid the result reached in Luckenbach v. W. J. McCahan Sugar Ref. Co.

Mr. Wagle of the Phœnix Assurance Company, Limited, testified, under objection, that, apart from the legal aspects of the loan receipt, he "guessed" the transfer of the money was an actual payment of the insurance claim. While I took this testimony tentatively and reserved ruling thereon, I think that it was clearly inadmissible, for the receipt showed on its face that the money was transferred to the assured as a loan only, and parol evidence was inadmissible to contradict its clear terms. Moreover, the witness' guess as to the effect of the transaction was plainly incompetent.

Under the authorities referred to I find against the respondent on this claim.

It is my conclusion that the respondent is liable for the damage to the libelant's goods and that the libelant should have an interlocutory decree therefor, with costs.

### Findings of Fact.

1. The libelant herein is a corporation organized under the laws of the state of California.

2. The respondent herein is a corporation organized and existing under the laws of the state of Delaware and at the times referred

706

to in the libel was the owner of the steamship J. L. Luckenbach.

3. The J. L. Luckenbach, at the time of the filing of the libel or during the pendency of process thereunder, was within the Southern District of New York and within the jurisdiction of the court.

4. The Victor Talking Machine Company, on or about September 15, 1929, shipped on the steamship J. L. Luckenbach at Philadelphia, Pa., 911 boxes containing radio receiving sets, equipment, records, parts and catalogues, in apparent good order and condition, for carriage to the port of San Francisco, Cal.

5. The libelant herein was the consignee of the goods and became the owner thereof in due course.

6. The J. L. Luckenbach, at the time in question, was in the intercoastal service between ports on the North Atlantic coast and ports on the Pacific coast of the United States.

7. The intercoastal voyage in question commenced at the port of Boston, Mass., and cargo was loaded at Boston, Philadelphia, and New York, in the order named.

8. The libelant's cargo was loaded at Philadelphia and was stowed in the No. 8 shelter deck of the J. L. Luckenbach, forward of the slat bulkhead in that compartment.

9. The No. 8 shelter deck was completely loaded with cargo and the No. 8 hatch was closed and battened down, at Philadelphia.

10. The voyage, so far as the libelant's cargo was concerned, commenced at the port of Philadelphia.

11. The J. L. Luckenbach left the port of New York, bound for Pacific coast ports, on September 18, 1929.

12. Upon the arrival of the J. L. Luckenbach at San Francisco the cargo of the libelant was found to be damaged.

13. During the voyage salt water entered the No. 8 shelter deck through a hole in a soil pipe leading through the shelter deck from the firemen's wash room situated on the weather deck above the No. 8 shelter deck.

14. The salt water which entered the No. 8 shelter deck came into contact with and damaged the libelant's cargo.

15. The hole was punctured in the pipe by a member of the crew of the J. L. Luckenbach in an effort to remove an obstruction in the pipe.

16. The pipe was punctured after the vessel's departure from the port of New York.

17. The J. L. Luckenbach was structurally seaworthy and properly manned, equipped, and supplied at the commencement of the voyage.

18. The scuppers in the No. 8 shelter deck were found, on the ship's arrival at destination, to be clogged.

19. The material found in the port scupper consisted largely of debris.

20. The evidence shows a lack of due diligence on the part of the respondent to make the No. 8 shelter deck fit, at the commencement of the voyage, for the safe carriage of cargo.

21. The respondent's lack of due diligence to make the compartment fit was the cause of the damage to the libelant's goods.

22. Some of the libelant's goods were removed from the respondent's custody on October 9, 1929, and the remainder were removed on October 10, 1929.

23. The receipt for the first lot of goods was signed on October 9, 1929, at about 10:30 a. m., and the receipt for the last lot was signed on October 10, 1929, at about 2:30 p. m., Pacific Standard Time.

24. A verbal claim for the damage to the libelant's goods was made by the libelant upon the respondent at its Philadelphia office on the morning of October 10, 1929, before the expiration of the time limit provided in clause 22 of the respondent's bill of lading.

25. A written claim for damage was mailed by the libelant at San Francisco, addressed to the respondent there, on October 9, 1929, and was received by the respondent on October 10, 1929, in the ordinary course of mail and before the expiration of the time limit in clause 22 of the respondent's bill of lading.

26. A formal claim for damage to the libelant's goods was mailed by Phœnix Assurance Company, Limited, at New York, addressed to the respondent at New York, on October 10, 1929, and was received by the respondent on October 11, 1929.

27. The Phœnix Assurance Company, Limited, insured the libelant's goods, and on January 17, 1930, advanced the sum of $6,679.75 to Victor Talking Machine Company in the form of a loan.

### Conclusions of Law.

1. The respondent, having received the libelant's goods in apparent good order and condition, and having delivered them dam-

aged at destination, has the burden of establishing that such damage was due to causes for which it is not responsible.

2. The act of a member of the crew of the J. L. Luckenbach, in punching a hole in the soil pipe leading from the firemen's wash room, after the ship left Philadelphia, was an error in management.

3. The respondent is not entitled to exemption from liability under section 3 of the Harter Act for the error of management, consisting of the puncturing of the soil pipe, because of its failure to show that due diligence was exercised at the commencement of the voyage to make the No. 8 shelter deck of the J. L. Luckenbach fit for the safe carriage of cargo.

4. There was a causal connection between the respondent's lack of due diligence as regards the fitness of the No. 8 shelter decks and the damage to the libelant's goods.

5. The proximate cause of the accumulation of water in the No. 8 shelter deck was the clogging of one or both No. 8 scuppers with debris.

6. Clause 22 of the respondent's bill of lading, concerning the making of claims for damage, is valid, in so far as it provides for the making of claims before the removal of the goods or the signing of final receipts therefor.

7. That part of clause 22 requiring a full disclosure of the nature and extent of the damage before the removal of the goods or signing of final receipts is unreasonable under the circumstances of the present case.

8. A verbal claim for damage was sufficient under clause 22.

9. A claim for damage made before the last receipt for any part of the libelant's goods was signed would be within the time prescribed by clause 22.

10. Under clause 22 it was not necessary that claims for damage be filed at destination only.

11. The burden is on the libelant to show that it made a claim for damage before removal of the goods or before the signing of the receipt for the last lot removed.

12. The libelant proved compliance with the first part of clause 22 providing for the making of claims for damage.

13. The second part of clause 22, providing that a demand for payment shall be made within ten days after delivery, is unreasonable under the circumstances of the present case.

14. The letter of the Phœnix Assurance Company, Limited, to the respondent, dated October 10, 1929, and received by the respondent on October 11, 1929, constituted, in any event, a sufficient compliance with the second part of clause 22, requiring a demand for payment.

15. The Phœnix Assurance Company, Limited, the insurer of the goods, was authorized to make claim for the damage on behalf of its assured in the absence of any specification in clause 22 as to who should make claims for damage.

16. The respondent waived compliance with the second part of clause 22, requiring a demand for payment.

17. The effect of the transfer of money from the underwriter to its assured under a loan receipt, is a question of law, and oral testimony, introduced for the purpose of contradicting or modifying the terms of such loan receipt, was inadmissible.

18. The respondent is not entitled to the benefit of the insurance effected on the libelant's goods.

19. The respondent is responsible for the damage to the libelant's goods.

20. The libelant is entitled to an interlocutory decree for its damages, with costs.

PATTERSON, District Judge.

The report will be confirmed.

1. The commissioner's finding as to the time when the soil pipe was punctured is supported by the weight of evidence. The commissioner was also correct in holding that as to the libelant's goods the voyage had commenced at Philadelphia. The Steel Navigator (C. C. A.) 23 F.(2d) 590.

2. There is support for the finding that the carrier failed to use due care at the commencement of the voyage to make the compartment fit for the safe carriage of cargo, both as to scuppers and as to angle iron. The Cornelia (D. C.) 15 F.(2d) 245. This is the one close issue in the case. The burden of proof here was on the carrier and the commissioner found that it had not been sustained. The Southwark, 191 U. S. 1, 24 S. Ct. 1, 48 L. Ed. 65.

3. The finding that the libelant complied with the requirements in the bill of lading as to prompt notice of damage and demand for payment is sound. The letter written on October 9, 1929, was an adequate notice and demand, and the inference was reasonable

that this letter reached the carrier before final receipts for the cargo were signed.

■ 4. The carrier is not entitled to the benefit of the libelant's insurance. Upon this feature the case cannot be distinguished from The Turret Crown (C. C. A.) 297 F. 766.